Filed 10/31/14  In re Richardson CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re ERIC TYRONE RICHARDSON, On Habeas Corpus. | C066987 (Super. Ct. No. 10F0403) |

In 1994, when defendant Eric Tyrone Richardson was 21 years old, he was convicted in a bench trial of second degree murder and corporal punishment of a child for the death of his 20-month-old daughter.  He was sentenced to state prison for 15 years to life for the murder (Pen. Code, § 187, subd. (a)), plus four years, to be served consecutively, for a prior instance of corporal punishment of a child on his daughter. (Pen. Code, § 273d).

In September 2009, at a subsequent hearing before the Board of Parole Hearings (the Board), the Board unanimously found defendant suitable for parole.

In February 2010, then-Governor Arnold Schwarzenegger (the Governor) reversed the Board's decision to grant parole.  We discuss the Governor's reasoning in more detail *post*.  In summary, the Governor found that:  (1) the commitment offense was "especially atrocious," (2) defendant "has still failed to obtain insight into the factors that caused his

1

murderous conduct," and (3) defendant's possible "relapse" into "abuse of marijuana" "could greatly increase [his] risk for violent recidivism."

Defendant filed a petition for writ of habeas corpus in the Sacramento County Superior Court seeking reversal of the Governor's decision. The trial court granted the petition, finding that the Governor's decision to deny parole was not supported by some evidence of current dangerousness. (*In re Lawrence* (2008) 44 Cal.4th 1181, 1212 (*Lawrence*).) The trial court reversed and vacated the Governor's decision and reinstated the Board's decision finding defendant suitable for parole.

The People filed a notice of appeal from the trial court's order. Thereafter, the People requested a stay of that order by writ of supersedeas. We granted the stay pending further order of this court.

The People contend the trial court's order must be reversed because the nature of defendant's commitment offense, his minimization of culpability, his lack of insight into the offense, and his past marijuana abuse provide "some evidence" to support the Governor's decision.

We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

As the central issue here is whether there is some evidence that defendant lacks insight into the commitment offense, we recount the various statements defendant made concerning the commitment offense and his insight in some detail here. We discuss defendant's marijuana abuse in the discussion section addressing that issue.

### The Commitment Offense
### According to the Probation Report

In February 1993, paramedics arrived at defendant's residence in response to a 911 call. The paramedics found a woman (defendant's then-girlfriend) performing mouth-to-mouth resuscitation on the victim, defendant's 20-month-old daughter. Defendant was present at the scene.

2

The paramedics originally received information that the victim had ingested ammonia, but no ammonia was detected on her breath. The paramedics noted that the victim's forehead was bruised, her teeth were clenched, her pupils were unequal, her abdomen was lacerated, and her legs had older lacerations.

The victim was taken to a hospital where she remained in a comatose state until she died three days later. The official cause of the victim's death was listed as " 'multiple blunt force trauma.' " The autopsy revealed multiple pattern injuries to the victim's head, chest, abdomen, arms and legs. A subdural hematoma was described as the "main responsibility" for the victim's death. The doctor who performed the autopsy opined that the subdural hematoma *may have* formed prior to the incident where defendant and the victim were present in the bathroom.[1]

However, the prosecutor who handled the case told the probation officer that the testimony indicating that the subdural hematoma was slow forming was disputed. According to the prosecutor, the doctor who had treated the victim prior to her death opined that the hematoma was a "fast forming injury and most likely occurred just prior to the paramedics['] arrival."

### The Victim's Injuries as Described in this Court's Opinion in Defendant's Appeal[2]

In this court's decision on appeal (*People v. Eric Tyrone Richardson* (Oct. 25, 1995, C018725 [nonpub. opn.] (*Richardson*)), trial evidence was summarized, including evidence concerning the victim's injuries and defendant's statements about the offense.

---

[1] In his decision, the Governor wrote: "[t]he doctor who performed the autopsy opined that the subdural hematoma *had been* formed prior to the night [the victim] went into the coma." (Italics added.)

[2] We take judicial notice of the appellate decision (Evid. Code, §§ 452, subd.(d), & 459, subd. (b)) and explain our reasoning for doing so *post*.

3

Regarding the injuries, this court wrote: "Pathologist Robert Anthony performed an autopsy on [the victim] which revealed she suffered a subdural hematoma and 'large intense areas' of subcutaneous bruising on her back, arms, legs and buttocks, consistent with the application of a large amount of force. More significantly, [the victim] suffered retinal and optic nerve hemorrhages, injuries observed normally in children who have been subjected to severe trauma, such as falling from a multistory building or being ejected during a car accident. From this, Anthony concluded [the victim] 'was subjected to extremely rapid acceleration and deceleration injuries that could be accounted for by shaking the child extremely violently. In other words, with the maximum force an adult can use on a child or having that force exerted on the child, then having the child impact against a surface.' [¶] Dr. John McCann, an expert in the area of pediatric child abuse who examined [the victim] shortly after her death and reviewed [the victim's] autopsy, concurred with Dr. Anthony." (*Richardson*, p. 4.)

### Defendant's Prior Statements to an Ex-Girlfriend
### According to the Probation Report

Investigation revealed that in October 1992, four months before the incident at issue, a prior ex-girlfriend had noticed " 'red welts' " on the victim's legs. When confronted about the welts, defendant told the ex-girlfriend that he had whipped the victim with an electronic cord because " 'she don't listen and come when I call her.' "

### Defendant's Statements During the Investigation
### According to the Probation Report

On the way to the hospital, the paramedics asked defendant how the injuries had occurred and defendant replied, "I beat her." He said the injuries had been inflicted on the previous day. During the ambulance ride to the hospital, defendant told one of the paramedics that he had beat the victim with a belt.

Sacramento County Sheriff's detectives interviewed defendant that night. Defendant said he was attempting to potty train the victim. He entered the bathroom, saw

4

ammonia on the floor, and " 'went into a rage.' "  He grabbed the victim by the back of the shirt, picked her up and tried to stand her on her feet.  Unable to stand unassisted, the victim fell and hit the back of her head on the bathroom floor.  Defendant again tried to stand her up, but she could not stand.  She was not breathing properly, her eyes were rolling back, and her eyelids were fluttering.  Defendant informed his girlfriend, who tried to resuscitate the victim, and then called 911.

When asked about the various bruises and marks on the victim's body, defendant said, " 'That's from me whipping her.' "  He said this whipping occurred after the victim drank urine from her porta-potty a couple of days prior to the interview.  Regarding a fresh bruise on the side of the victim's forehead, defendant said, " 'she be bumping her head up against the wall all the time.  That bruise ain't even from me.' "

### Defendant's Statements During the Investigation from the Appellate Opinion

Defendant told the ambulance driver that he hit the victim because "she had drank some urine from her little potty chair."  That same night at the hospital, defendant told a clinical social worker that the victim was asthmatic and after finding her on the bathroom floor, he called 911.  Defendant later told the social worker that he heard a loud noise in the bathroom and found the victim on the floor.  Thinking she had hit her head on the wall, defendant lifted her several times, but she kept falling down.

That same night, defendant told a detective that the victim was in the bathroom on the potty when he found ammonia on the floor and on her.  Going into a rage, defendant grabbed the victim by the back of the shirt, picked her up and tried to get her to stand.  When he let her go, the victim fell and hit her head on the floor.  He tried to pick her up again, but she could not stand and her eyes were rolling back in her head.  When the detective explained the nature of the victim's injuries and asked defendant whether he had shaken her, defendant admitted shaking the victim.  (*Richardson*, pp. 3-4.)

5

## Defendant's Statements to the Probation Department
## Post-Conviction

After the trial, defendant told the probation officer who prepared the probation report that he had been " 'severely stressed' " several days before the victim was hospitalized. He said he had whipped the victim because she " 'drank pee out of a potty.' " On the day when the victim was taken to the hospital, defendant said he grabbed the victim twice by the arm in attempts to get her to stand on her feet. The victim was " 'limp' " and fell to the ground twice, striking her head on the floor during one of the falls. He picked her up a third time and the victim felt extremely limp. Regarding the bruise to the victim's head, defendant said that injury must have occurred when she fell limp and hit her head on the floor. He denied striking the victim in the head.

Defendant told the probation officer that he thinks about the victim every day. Her death was not premeditated. Rather, he was under stress and lost control.

## Defendant's Statements in the
## 2004 Psychological Evaluation Report

The clinical psychologist who evaluated defendant in 2004 wrote the following concerning what defendant told him about the commitment offense:

"I came into the bathroom. The victim had taken her potty and poured it out on the floor, she was sitting next to it -- she had it in her hand. At that time, I snatched her off the floor but she couldn't stand, her balance was poor. When she sat back down, I pulled her up again and this time she fell forward and hit her head on the ground (her forehead). I saw then that something was wrong with her, I attempted to administer CPR -- the best I could! I called 911 -- my friend Maria helped me by also giving the baby CPR. I called the ambulance, the ambulance came and went to the hospital. They asked me what happened in the ambulance and questions into my past physical abuse. I answered affirmative to the above questions. I was arrested while at the hospital."

6

"*Feelings*: I pretty much faced it -- what I did! I used to have excuses for things then -- I didn't take responsibility for my actions -- but on the night that this happened I did take responsibility. When traumatic things happen -- things that virtually I didn't see has become clear. My arrogance -- got me into trouble. I didn't have the responsibility for being a parent. I realize that. The thing that hurts me the most, I betrayed my daughter's trust to take care of her to protect her I turned out to be the one that hurt her. I took away her right to live -- life! The thing that will stay with me for the rest of my is the fact that I betrayed her trust. It wasn't her that I was angry with -- I was just angry at life! I was rebellious, running away from authority. I was angry at many things. I took on a responsibility I was <u>not</u> ready for. The problems with parenting -- I cracked under the pressure. I was an angry, selfish, bitter person -- my daughter did <u>not</u> deserve this in any way! The beatings relieved the anger for a short while. I had unreal expectations of her -- I told her to do something to do and she didn't do it -- I felt that she was being bad (not listening) this would justify her being punished. I had been through a lot of learning trying to figure out who I am, and it started to come together during the last four to five years! The rebelliousness against authority, I face this. I was feeling my anger and acting on it! I looked and made a serious moral inventory -- determining what was lacking and attempting to change. Before I lashed out at diversities [*sic*], now I prepare myself in a non-violent way (violence was my only response). I was a coward -- I didn't know how to deal under pressure. I want it to be known -- I am not here to put this program up against the crime I have committed. I am here for the sole reason -- to take responsibility for my actions and for the crime I have committed."

**Defendant's Statements in the
2008 Psychological Evaluation Report[3]**

The psychologist wrote the following concerning what defendant told him about the commitment offense:

"When asked to describe the controlling offense, [defendant] stated, 'I walked into the the bathroom and she had poured out the Port-A-Potty.  I thought she had drank it, I was real upset, I told her to get up and I pulled her up to her feet and she fell on her head. I noticed that she was limp and she seemed to be acting kind of strange.  I tried to do CPR and then I called 911, that's what happened.'

"When this examiner queried the inmate regarding claims of his past abuse of the victim, he stated, 'Yeah, I would get angry and I would spank her, she did not deserve it though.  My perspective was unrealistic; I was way out of line.  I was too immature to be a parent….'

"When this examiner asked the inmate why he committed the crime, he stated, 'Well I was an angry person, I did not have the capacity for parenthood, I just totally failed at it.'  When asked if alcohol or drugs were involved in this crime, he stated, 'No, they were not.'  The inmate then spontaneously noted to this examiner that he thinks about the victim on a daily basis and feels tremendous remorse for what he has done. When this examiner asked the inmate if he believes that his sentence was fair, he stated, 'Yes I do.'  When this examiner asked the inmate to discuss why he believes his sentence

---

[3] Although not referenced by the Governor or the parties in this appeal, the record before us includes a psychological evaluation report written in 2005 by a psychiatrist who wrote the following regarding what defendant told him about the commitment offense:

  "The inmate acknowledges that he had become abusive with his 20-month-old daughter.  He was not prepared to be a single parent.  Up until a month prior to the death of his daughter he had been living with two friends who were providing much more childcare and support than he had acknowledged or recognized."

8

is fair, he stated, 'I did not get up in the morning and say that I wanted to take her life, but *my behavior was negligent* and I think I should stay in jail for as long as the sentence. But on a personal level I feel like I should do the sentence that I was convicted of.' " (Italics added.)

### Defendant's Statements During the 2009 Parole Hearing

At the beginning of the 2009 parole hearing, counsel for defendant indicated that defendant would not discuss the facts of the commitment offense,[4] but was willing to discuss "insight and remorse."

Defendant told the Board that he had been frustrated and angry since age nine when his grandmother died. Defendant said, "For me, anger was a launching pad that led to rebellion to authority. When I was controlled by this anger, I literally turned my mind against established authority. When I say established authority, I mean my mother in the home, my teachers in the [school], and any other adult that was in my periphery. I viewed myself as their equals and thus reflected [*sic*] their tutelage. By doing this, I rejected the training that would have given me the mental capacity to cope with adversity in life. I matured physically but not mentally. This rebellious mental attitude caused me to create my own viewpoint about life, a viewpoint that was totally divorced from reality. One of my major flaws was my misunderstanding of what it meant to be an adult. In my mind, an adult was someone who did not have to live by rules, they could do what they wanted, when they wanted, so I did the things I associated with adulthood, such as drinking, using marijuana and never answering to anyone. As time went on, my rebelliousness and anger grew. I isolated myself from those who loved me and set out to

---

[4] "A prisoner may refuse to discuss the facts of the crime *in which instance a decision shall be made based on the other information available* and the refusal shall not be held against the prisoner." (Cal. Code Regs., tit. 15, § 2236, italics added.) But see footnote 11, *post*.

prove to them all that I didn't need them. I mention this now in hindsight. At the time it was happening, I was blind to the gravity of my actions. The more I live by my flawed viewpoint, the more I took on things in life I had no capacity for. Because of that, I failed a lot. When I failed, though, I didn't take responsibility for it. I blamed others. My failures made me more angry and more determined to prove everything wrong, so to speak. I had a one-sided war going on with the authority figures in my life. Flawed thinking and flawed actions perpetuated themselves until I self-destructed. I was unteachable and recalcitrant and eventually overwhelmed by the life that I had created with my bad decisions. Teachability and self-examination have been the keys to my road back from anger. Once I became teachable, I was able to receive the training that I needed to mature. At that point, it was all about exposing myself to better knowledge. When I say better knowledge, I mean knowledge that was better than the warped viewpoint that I had had held. I exposed myself to numerous self-help classes, drug classes, parenting classes, anger management classes, alternatives to violence classes, and I read personal self-help book. Exposing myself to these classes gave me the problem-solving devices that I needed to deal with my anger issues. As my understanding grew, my anger subsided."

"I didn't have the mental stability to deal with the responsibility of parenthood. I wasn't objective. You know, I was emotional about it. I took everything personally. I put these unrealistic expectations on [the victim], and when she didn't live up to them, I took it personal instead of looking at it like she's a child, you know what I mean, I have to be the adult, the stable one, the mature one. You know, and I didn't -- I didn't have the sensitivity, the maturity…."

Defendant did touch on the commitment offense when he was asked to discuss remorse. He said, "the best way I can describe remorse is I betrayed the trust of someone who trusted me implicitly, I mean, without waver, she trusted me and instead of training her and raising her, I abused her and took her life. I mean, I would have to imagine being

betrayed by someone that I trusted that much. You know, that's the only thing I can relate it to, be betrayed by someone that you trust completely. She was innocent. She didn't deserve what I did to her or the way that I treated her."

In his closing remarks, defendant said, "I'm guilty of this crime. I'm sorry for what I've done. [The victim] didn't deserve the way that I treated her."

### 2004 Psychological Evaluation – Current Dangerousness

The psychologist opined that defendant's propensity for violence in society would be no greater than that of the average person. The psychologist added, "In a less controlled setting such as return to the community, this inmate can be considered likely to hold present gains." In discussing the "low risk factors," the psychologist wrote, "Drugs/alcohol did not play any role in the offense, no record of aggression or violence in prison. The inmate has maintained a long-term presence in NA. Overall adaptation to prison life has been positive and constructive. The offense was not committed during the commission of another crime. The offense does not appear to be premeditated. The inmate acknowledges he committed the offense. He fully acknowledges the wrongfulness of actions. This inmate appears to take full responsibility for the offense and does not appear to rationalize or minimize his role. He appeared to fully express remorse for his actions. When asked, he shared extensive expressions of guilt to remorse. This inmate appears to take full responsibility for his actions and can empathize at an emotional level with the harm done to the victim. The inmate is not diagnosis [*sic*] in antisocial personality disorder. Criminal mindedness and criminality did not appear to be the primary elements of this inmate's offense." The psychologist added, "This inmate has demonstrated a good awareness of the circumstances that resulted in his committing this serious offense with the ability to utilize judgment before acting and examine the resulting consequences of those decisions."

11

## 2008 Psychological Evaluation – Current Dangerousness

Defendant scored in the low range for future violence on two risk assessment tools used by the clinical psychologist who performed the 2008 evaluation. The psychologist opined that defendant's overall risk of future violence in the community is in the low range. As for the extent to which defendant had explored the commitment offense and come to terms with the underlying causes, the psychologist wrote, "[Defendant] appeared to grasp the underlying causes for his actions in the controlling offense. He was able to speak articulately about how his anger, unrealistic expectations and his immaturity were influential factors that guided his negative thoughts and behaviors. This examiner does not believe that the inmate placed blame on external or uncontrollable factors. He appeared to take responsibility for his actions."

## The Board's Decision Granting Parole

The Board concluded that defendant was suitable for parole and would not pose an unreasonable risk of danger to society or a threat to the public if released from prison. The Board acknowledged the "horrible nature of this commitment offense." It found that the victim "died as a result of injuries that had been inflicted upon her over a period of time. It was not a singular event culminating on [the day the victim was taken to the hospital]."

The Board noted that defendant had no juvenile record except a theft and he had no history of violent crime.

The Board further concluded that defendant had enhanced his ability to function within the law upon release by: obtaining a GED and AA and continuing to take college courses; participating in AA and NA, including serving as an executive board member in AA; participating in victim awareness, domestic violence, Creative Conflict Resolution, the Alternatives to Violence Project, additional anger management, self-confrontation and personal development and life management; completing vocational training, such as auto painting, vocational clerical business tech, and vocational plumbing. Defendant had

12

"maintained positive institutional behavior," including no CDC 115 reports during his entire period of incarceration.

The Board further stated that there is a reduced probability of recidivism "because of maturation, growth, greater understanding and advanced age" and that defendant had viable parole plans, including the availability of housing and a job offer, with substantial transitional funds to provide a financial bridge.

The Board noted its consideration of the psychological evaluations. It specifically noted the low risk of future violence. It also noted the psychologist's observation in the 2004 psychological evaluation that defendant had "demonstrated a good awareness of the circumstances that resulted in [his] commission of the serious offense and [his] ability to utilize judgment before acting and examine the resulting consequence of decisions."

The Board found that defendant had "shown signs of remorse indicating [he] understand[s] the nature and magnitude of the offense. You've accepted responsibility for criminal behavior and shown a desire to change towards good citizenship, this occurring in psychological evaluations and also in the closing comments that were provided to the Panel today."

## The Governor's Decision

The Governor acknowledged positive aspects of defendant's past and his prison programming. He noted that defendant had only one prior brush with the law prior to the commitment offense, a juvenile adjudication for petty theft. The Governor observed that while defendant was counseled three times for misconduct, the most recent was in 1999 and defendant has remained discipline free. Defendant earned his GED in 1997. He has since received an Associate of Arts degree, and once received a certificate for being on the Dean's List, receiving a grade point average of 3.75. Defendant has also received training in business-related technologies and completed vocational training in upholstery, plumbing, and auto painting and detailing. He held institutional positions as a clerk, typist, and word processor. He has "availed himself of an array of self-help and therapy

programs, including Alcoholics Anonymous (AA), Narcotics Anonymous (NA), a special program within NA, and a four-step, video group participation program: The Foundation of Recovery, Coming to Believe, Making a Decision, and Getting Honest." Defendant "also participated in Self-Confrontation, Personal Development, Life Management, Anger Management, American Program, Substance Abuse Program, and Bible studies through Set Free Ministries. Additionally, he graduated from the tier one level of Cross Roads Bible Institute…. [H]e received some positive evaluations from mental-health and correctional professionals."

Nonetheless, in summarizing his decision to reverse the Board, the Governor stated, "The gravity of the crime is a factor supporting my decision, but *I am particularly concerned by the evidence that* [*defendant*] *lacks complete insight into his life crime.* I am further troubled by the findings of his most recent mental-health evaluator" related to defendant's involvement with marijuana. (Italics added.) We discuss the Governor's reasoning in detail, *post*.

## DISCUSSION

The People contend "some evidence" supports the Governor's decision; thus, the decision did not violate defendant's due process rights, and the trial court's decision granting a writ of habeas corpus should be reversed. We agree.

## I. General Principles of Review

"Whether to grant parole to an inmate serving an indeterminate sentence is a decision vested in the executive branch, under our state Constitution and statutes. The scope of judicial review is limited." (*In re Shaputis* (2011) 53 Cal.4th 192, 198-199 (*Shaputis II*).) "[W]hen a court reviews a decision of the Board or the Governor, the relevant inquiry is whether *some evidence* supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety[.]" (*Lawrence*, *supra*, 44 Cal.4th at p. 1212, first italics added, second italics in original; *In re Shaputis* (2008) 44 Cal.4th 1241, 1254-1255 (*Shaputis I*).) "The 'some evidence' standard, is

14

meant to serve the interests of due process by guarding against arbitrary or capricious parole decisions, without overriding or controlling the exercise of executive discretion." (*Shaputis II*, *supra*, 53 Cal.4th at p. 199.)

"[R]eview under the 'some evidence' standard is *more deferential* than substantial evidence review, and may be satisfied by a lesser evidentiary showing. [Citation.]" (*Shaputis II*, *supra*, 53 Cal.4th at p. 210, original italics.) "[U]nder the 'some evidence' standard, '[*o*]nly a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of [the Board or] the Governor…. [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of [the Board or] the Governor.' " (*Id.*, italics added.) "When reviewing a parole unsuitability determination by [the Board] or [the Governor], a court must consider *the whole record in the light most favorable to the determination* before it, to determine whether it discloses some evidence—a modicum of evidence—supporting the determination that the inmate would pose a danger to the public if released on parole." (*Id*. at p. 193, italics added.) Our high court has made it clear, "It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the…decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the…decision. [Citations.]" (*Id*. at p. 210.) "Only when the evidence reflecting the inmate's present risk to public safety leads to but one conclusion may a court overturn a contrary decision by the Board or the Governor." (*Ibid*.)

Because the trial court's findings were based solely upon documentary evidence, we independently review the record that was before the trial court. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 677 (*Rosenkrantz*).) However, we are not limited to the evidence

15

actually mentioned by the Board or the Governor in their decision. (*Shaputis II*, *supra*, 53 Cal.4th at p. 214, fn. 11; *In re LeBlanc* (2014) 226 Cal.App.4th 452, 457.)

## II. Lack of Insight into the Commitment Offense

### A. Judicial Notice of the Appellate Court Opinion

Preliminarily, we address an anomaly in this case resulting from the Governor's failure to fully identify all of the documents on which he relied for the evidence he set forth in his written decision. The Governor noted the probation officer's report and the 2004 and 2008 psychological evaluations as the source of the information upon which he relied, yet he relied on evidence not in those reports.

As we will discuss in more detail, the Governor's conclusion that defendant lacks insight into the commitment offense is grounded on a discrepancy between the nature and severity of the injuries sustained by the victim and defendant's description of the crime in the reports as well as the variations in the versions of the offense defendant has given over the years.

The Governor began his description of the offense in his written decision by saying, "*According to the probation report*, when the paramedics arrived at [defendant's] home after receiving a 9-1-1 call, [defendant] told them that [the victim] had ingested ammonia. As the paramedics attempted to rescuscitate [the victim], they did not smell ammonia on her breath. They observed a bruise on her forehead, her teeth were clenched, and her pupils were unequal. They also noted lacerations across her abdomen and on her legs. Aside from the bruising on the back, arms, legs and buttocks consistent with the application of a large amount of force, [the victim] *suffered retinal and optical nerve hemorrhages as well as injuries normally observed in children who have been subjected to severe trauma, such as falling from a multi-story building or being ejected during a car accident.* When the paramedics asked [defendant] how the infant received these injuries, he stated that he beat her…." (Italics added.)

16

The problem is that the injuries described in the above italicized text are not in the probation report as suggested by the Governor in the first sentence of the above quoted paragraph; nor is it in any other report or document in the record. Nevertheless, the People rely on that statement in their briefing.

It seems apparent that the trial court questioned the source of the facts upon which the Governor relied. The court wrote in its order granting defendant's petition for habeas corpus, "Although it is unclear what evidence relating to facts of the commitment offense the Governor considered, it appears that at a minimum, he relied on the probation report."

We were also puzzled by the Governor's reliance on facts that were not before the trial court and not part of the record before us. Noting that this court's opinion in the underlying criminal appeal had been referenced by both parties at the parole suitability hearing, but not by either party in the trial court or on appeal here, we examined the opinion and discovered therein the reference to the nature of the injuries the Governor had attributed to the probation report.

The pathologist's testimony was discussed as part of this court's determination in *Richardson* that the evidence of implied malice was sufficient to support the second degree murder conviction. In describing that the injuries were consistent with shaking, the pathologist said, "[the victim] *suffered retinal and optic nerve hemorrhages, injuries observed normally in children who have been subjected to severe trauma, such as falling from a multistory building or being ejected during a car accident*." The italicized text closely mirrors the statement made by the Governor he attributed to the probation report.

The Board considered and heard argument concerning aspects of what this court said in the *Richardson* opinion.[5] At the beginning of the hearing, the lead commissioner

---

[5] A deputy district attorney who appeared at the parole hearing referenced *Richardson*. In arguing that the inmate's version of what had occurred is inconsistent with the injuries, the prosecutor said, "[H]e has continued to relate this crime as basically an accident,that

17

stated, "Nothing that happens here today is going to change the findings of the court.  The Panel's not here to retry your case, but we do accept as true the court's findings.  We're here for the sole purpose of determining your suitability for parole.  All that being said, *in that you've exercised your right not to speak to the commitment offense, I'm going to go ahead and incorporate by reference the facts of the commitment offense as found in two different sources, one being the probation officer's report, the other being the appellate decision.*"[6]  (Italics added.)

It appears that the Governor's reference to the nature of the victim's injuries, which he attributed to the probation report, actually came from *Richardson.*  Thus, it appears that the Governor actually relied upon this court's opinion in *Richardson* in addition to the probation report and the 2004 and 2008 psychological evaluations.  Because the Board had considered and heard argument concerning facts set forth in *Richardson*, the Governor was entitled to consider it.  (*In re Arafiles* (1992) 6 Cal.App.4th 1467, 1477-1478.)

Evidence Code section 452, subdivision (d), provides that judicial notice may be taken of records of any court of record.  We may take judicial notice even if the item to be noticed was not furnished by a party. (Evid. Code, § 459, subd. (d).)  We requested

---

he basically pulled his daughter up from a seated position on two occasions.  She fell once and hit her head, and *yet we know from the facts that you have been able to review and from the appellate opinion that that is not what occurred,* and I have not yet heard [defendant] take responsibility for that." (Italics added.)  We discuss *post* additional references to the facts in *Richardson* argued by counsel for defendant at the parole hearing.

[6] The commissioner also stated, "I will incorporate your version of the crime found in the Board report that was prepared for the May 2007 calendar by your correctional counselor."  This report is not in the record before us.  Nor are there any reports prepared by correctional counselors in the record.  And the Governor did not refer to a correctional counselor's report in his written decision.

supplemental briefing from the parties on the following issues:  (1) "Should this Court take judicial notice of its opinion in *People v. Eric Tyrone Richardson* (Oct. 25, 1995, CO18725 [nonpub. opn.]), which was considered by the Board, apparently considered by the Governor, not provided to the trial court, and which is not part of the record on appeal?" (2) "If this court takes judicial notice of that opinion, what impact would it have on the 'some evidence' analysis in our review of this habeas corpus case?"

Defendant contended in his supplemental briefing that we should not take judicial notice of *Richardson* because:  (1) "the opinion…was not considered in the Governor's action at issue"; (2) the facts set forth in the opinion were, as required, "reported in a light favorable to the prosecution" and that we cannot take notice of the truth of the facts contained in the opinion; (3) the facts set forth in the opinion are irrelevant "absent a rational nexus to the [defendant]'s current parole risk"; and (4) the opinion was not "part of the trial or appellate court records and has not been referenced or noticed by the parties or the courts."[7]  The People assert that we should.[8]  We agree with the People and take judicial notice of this court's own decision in *Richardson.*  Specifically, we take judicial

---

[7] At oral argument, counsel for defendant appeared to concede we could take judicial notice of our opinion in defendant's appeal.  Nonetheless, we address the arguments raised in defendant's supplemental brief.

[8] At oral argument, counsel for the People contended that the decision in *In re Young* (2012) 204 Cal.App.4th 288 (*Young*) (a case published after supplemental briefing) supports notice of the appellate decision here.  We do not view *Young* as providing authority for the reason we take judicial notice of the appellate opinion here.  In a footnote, the *Young* court wrote, "Neither party, nor the Board, has referred to our opinion and we do not know if it was in the record available to the Board.  We take judicial notice of it pursuant to Evidence Code section 452, subdivision (a) to explain this background, *but do not otherwise rely on it herein*."  (*Id.* at p. 293, fn. 1, italics added.)  Because the *Young* court relied on its appellate opinion for background only, we do not rely on it here.  Instead, we agree that judicial notice should be taken here for the reasons we discuss *post*.

19

notice of the facts set forth therein referenced by the Governor in his decision and the parties during the parole hearing.

Defendant contends that the Board did not indicate it considered or relied on the facts in the appellate decision. However, as we have noted, when defendant indicated he desired not to talk about the commitment offense, the presiding commissioner stated that the Board was incorporating by reference the facts set forth in both the probation report and the appellate decision.

Defendant contended in his supplemental briefing that the Governor relied exclusively on the facts set forth in the probation report. But as we have shown, key facts upon which the Governor relied were not in the probation report; those facts were in this court's decision in *Richardson*. Moreover, as we have noted, in determining whether a decision is supported by some evidence, we are not limited to the evidence actually mentioned by the Board or the Governor in the decision denying parole. (*Shaputis II*, *supra*, 53 Cal.4th at p. 214, fn. 11; *LeBlanc*, *supra*, 226 Cal.App.4th at p. 457.) Accordingly, we need not be limited to the sources of evidence mentioned by the Governor here, especially when the Governor expressly relies on facts from a source he did not mention, and attributes those facts to the wrong source.

Defendant also contended in his supplemental briefing that it would be inappropriate to take judicial notice of facts set forth in *Richardson* because in reviewing the sufficiency of the evidence, an appellate court views the trial evidence in the light most favorable to the prosecution. He also asserted that in taking judicial notice, we must limit our notice to the existence of the opinion and the result reached and cannot take notice of the truth of facts stated therein. Thus, according to defendant, judicial notice cannot be used to establish the facts of the underlying commitment offense.

First, as we have already noted, the Board considered the facts from *Richardson*. Second, counsel for defendant implored the Board to consider facts this court set out in *Richardson* in arguing that defendant admitted injuring the victim and never claimed she

20

was injured accidentally.  Counsel argued, "if you take a look at the appellate opinion transcripts [*sic*], at page 2, pages 2 through 4, you have [defendant], when the -- when he was talking to one of the detectives at the station, the appellate transcripts [*sic*] recount this, he says, 'I beat her.'  He said that in the ambulance, and that's borne out by the record, and he also admits to shaking her.  That's borne out by the record, so to say that [defendant] is relying on the notion that this is an accident and then to sort of hang that on to this minimization, lack of insight, is not just born out by the record.  He admits very early on that he's responsible…."  Counsel also argued to the Board, "I'd also draw the Panel's attention to page 4 of the appellate court's opinion where you have Dr. McCann and Dr. Anthony concurring that the injuries could have resulted from the shaken baby syndrome, which is what [defendant] admitted to detectives early on, and those were the People's witnesses.  Those weren't [defendant's] witnesses, so both of those experts confirmed that this could have been the result of that incident."  Third, regarding the contention that the facts set forth in *Richardson* are facts stated in a light most favorable for the prosecution, that circumstance is of no consequence if the Board or Governor considered or relied upon those facts.  This is especially true here, where defendant relied on the truth of those facts in his argument to the Board.  Fourth, our review here is deferential and limited to determining whether there is a *modicum* of evidence upon which the Governor relied, regardless of the weight that could be assigned to that evidence, and in making that determination, we must view the evidence cited by the Governor in a light most favorable to his decision.  (*Shaputis II*, *supra*, 53 Cal.4th at pp. 210, 213-214.)  The " 'some evidence' " standard may be satisfied by a *lesser* evidentiary showing than substantial evidence review.  (*Id.* at p. 209.)  Moreover, it is not our role to decide which evidence in the record is convincing.  (*Id.* at p. 211.)  Accordingly, the fact that this court set out facts in its opinion on defendant's appeal pursuant to a substantial evidence review makes no difference to the propriety of factoring those facts into our review here for "some evidence."

21

In his supplemental briefing, defendant relied upon this court's opinion in *Gilmore v. Superior Court* (1991) 230 Cal.App.3d 416 in arguing we are limited to taking judicial notice of the existence of the opinion and the result on appeal and cannot take notice of the truth of facts set forth therein. In *Gilmore*, defendant sought a writ of mandate directing the trial court to grant his summary judgment motion in a wrongful death action on the ground that defendant killed the decedent in self-defense and that the killing was justifiable as a matter of law. The defendant requested the trial court to take judicial notice of an appellate opinion in which the defendant obtained a reversal of his criminal conviction because the undisputed evidence showed a justifiable homicide as a matter of law. (*Gilmore*, *supra*, 230 Cal.App.3d at p. 418.) This court stated that the existence of the appellate opinion and result reached can be judicially noticed, but "ordinarily" it would be error to take judicial notice of the facts therein for the truth of those facts. (See also *Kilroy v. State* (2004) 119 Cal.App.4th 140, 145.)

We do not think the well-settled general rule stated in *Gilmore* applies here. We may take judicial notice of the facts in *Richardson* for the nonhearsay purpose of ascertaining the basis for the decisions of the Board and the Governor and then consider that in determining whether the decision of the Governor was supported by "some evidence."

In *People v. Woodell* (1998) 17 Cal.4th 448, our high court held that for purposes of determining the nature of prior convictions under the Three Strikes law, a trial court may rely upon the appellate opinion related to the prior conviction to determine the nature of the conviction. (*Id*. at pp. 451, 454.) The trial court admitted the appellate opinion related to defendant's out-of-state conviction as proof the defendant had personally used a deadly weapon. (*Ibid*.) Our high court held the opinion was admitted for the non-hearsay purpose of determining whether defendant had been convicted of a crime based on personal use of a weapon. (*Id*. at p. 460.)

22

Similarly, in *In re Jimmy Richardson* (2011) 196 Cal.App.4th 647,[9] this court held that an appellate opinion related to the defendant's prior conviction was admissible to show that the defendant was convicted for personally inflicting great bodily injury. Citing *Woodell*, this court stated, "Our unpublished opinion on the appeal from the [prior] conviction stated it was [defendant] who crashed his vehicle while evading law enforcement officers. Our opinion stated [defendant], while being pursued by law enforcement officers, 'failed to negotiate the turn, crashed through a cinder [block] fence, and landed on top of a carport awning attached to a mobile home. The awning gave way, crashed into a car parked beneath it, and damaged another nearby mobile home. Two occupants of that mobile home were injured by flying debris.' [Citation.] [¶] That opinion was admissible evidence on which the trial court [that determined the truth of the prior conviction allegation] could rely. [Citation.] Our opinion, and not just [defendant]'s plea, established [defendant] was convicted for personally inflicting the injuries." (*Id.* at pp. 660.) This court further found that the appellate opinion could be considered on the additional issue of whether the victims were accomplices. This court stated, "[the appellate opinion on the prior] evasion conviction stated [defendant]'s victims were occupants of a mobile home that was damaged by [defendant]'s crash. Our opinion is evidence in the record of conviction that establishes the victims of the 1992 evasion conviction were not accomplices, and therefore the evasion conviction qualifies as a prior strike." (*Id*. at p. 667.)

Similarly, here, the Board's decision was based on the facts presented to it from a number of sources, including this court's opinion in *Richardson*. Likewise, it is clear that the Governor based his decision, in part, on *Richardson*'s discussion about the nature of the victim's injuries.

---

[9] We refer to the defendant's first name to distinguish this court's published opinion in that case from the unpublished opinion in defendant's appeal.

We note that the probation officer's report and the psychological evaluation reports are also filled with hearsay,[10] but courts nevertheless customarily look to such reports when relied upon by the Board or Governor to determine whether some evidence supports the Board's unsuitability determination and the Governor's decision to reverse the Board's finding of suitability. Parole proceedings are informal proceedings, not judicial or formal administrative proceedings. (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 664.)

Defendant argued in his supplemental brief that judicial notice is inappropriate because the opinion in *Richardson* is not in the trial or appellate record and "has not been referenced or noticed by the parties or courts." Given that defense counsel relied upon the *Richardson* opinion in convincing the Board to find defendant suitable for parole, defendant can hardly claim surprise if that is what he sought to imply in his supplemental brief. We recognize that the underlying rationale for judicial notice is that the matter being judicially noticed is not reasonably subject to dispute. (*Lockley v. Law Office* (2001) 91 Cal.App.4th 875, 882.) However, having argued certain facts from *Richardson* in his successful effort to obtain a finding of parole suitability from the Board, defendant cannot now be heard to say those facts are subject to dispute. And indeed, defendant has not made that argument.

We also recognize that while appellate courts can take judicial notice of items not presented to the trial court, we generally refrain from doing so. (See *Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325-326 (*Brosterhous*); *People v. Preslie* (1977) 70 Cal.App.3d 486, 493 (*Preslie*).) As the court in *Preslie* explained, "as a general rule the court should not take such notice if, upon examination of the entire record, it appears that the matter has not been presented to and considered by the trial court in the first instance." (*Preslie*, at p. 493.)

---

[10] The probation report said that the information concerning the offense came from the Sheriff's report, the Coroner's report and the preliminary hearing transcript.

However, cases discussing the general rule against taking judicial notice typically involve appeals from adjudications in the trial court where the items to be noticed involve facts or something else that should have been considered in the trial court *in the first instance*. (E.g., *Brosterhous*, *supra*, 12 Cal.4th at pp. 325-326 [appellate court denied request to take judicial notice of the entire record of a prior arbitration proceeding to support a demurrer grounded on a claim of res judicata]; *Preslie*, *supra*, 70 Cal.App.3d at p. 493 [in reviewing trial court's denial of suppression motion, the appellate court properly declined to take judicial notice of the affidavit, search warrant, and return lodged in the trial court, but not introduced into evidence]; see also 1 Witkin, Cal. Evidence (5th ed. 2012) Judicial Notice, § 50, p. 157.) Neither situation is presented here. The trial court's role was not to decide issues or facts in the first instance, but rather to review the Governor's decision. Here, we exercise our discretion to take judicial notice where our review is of the Governor's decision, not the trial court's ruling on that decision. (See *Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 975, fn. 5 [appellate court took judicial notice of item not presented in the trial court because appellate review was de novo and the item was material].)

Lastly, we note that our Supreme Court has stated that courts "must consider *the whole record* in the light most favorable to the determination before it, to determine whether it discloses some evidence…." (*Shaputis II*, *supra*, 53 Cal.4th at p. 214, italics added.) We believe our high court's mandate to consider "the whole record" relates to the record before the Board and the Governor, not the partial record provided to the trial court or to us by the parties.

Accordingly, we take judicial notice of this court's opinion in *Richardson* because counsel for defendant argued facts from it to the Board and the decisions of the Board and the Governor were based, in part, upon the facts set forth in the opinion.

## B. Analysis

Our high court has said, "Consideration of an inmate's degree of insight is well within the scope of the parole regulations. The regulations do not use the term 'insight,' but they direct the Board to consider the inmate's 'past and present attitude toward the crime' (Regs., § 2402, subd. (b)) and 'the presence of remorse,' expressly including indications that the inmate 'understands the nature and magnitude of the offense.' (Regs., § 2402, subd. (d)(3)). These factors fit comfortably within the descriptive category of 'insight.' " (*Shaputis II*, *supra*, 53 Cal.4th at p. 218.) "[T]he presence or absence of insight is a significant factor in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety. [Citations.]" (*Id*.) "Lack of insight pertains to the inmate's current state of mind, unlike the circumstances of the commitment offense…. Thus, insight bears more immediately on the ultimate question of the present risk to public safety posed by the inmate's release." (*Id.* at p. 219.) And "the most recent evidence of the inmate's degree of insight will usually bear most closely on the parole determination." (*Id*. at pp. 219-220.) However, similar to *Shaputis II,* this case is an example of the Governor's "proper reliance on older evidence in the record, and of the disadvantages that may follow from an inmate's decision not to testify at a parole hearing or otherwise cooperate in the development of current information regarding his…mental state." (*Id*. at p. 220.)[11]

---

[11] Like our high court, we acknowledge that a defendant is not required to provide a statement about the commitment offense. (*Shaputis II*, *supra*, 53 Cal.4th at p. 211.) However, as our high court has suggested, an inmate who restricts the information available to the Board and the Governor is in no position to complain about their reliance on older information. (*Id.* at p. 198.) The *Shaputis II* court also observed, "An inmate who refuses to interact with the Board at a parole hearing deprives the Board of a critical means of evaluating the risk to public safety that a grant of parole would entail. In such a case, the Board must take the record as it finds it." (*Id.* at p. 212.) It went on to note, "that nowhere in the record is there a *coherent account* by [defendant] of the shooting and how or why it happened. Nowhere is his claim of accident reconciled with the

In elaborating on the crime and his reason for reversing the Board, the Governor stated, "the second[]degree murder for which [defendant] was convicted was especially atrocious because [defendant] was in a position of trust regarding his particularly vulnerable 20-month-old daughter. According to the probation report, [the victim] had extensive bruises all over her body that indicated her injuries might have been caused on *at least* three separate occasions and could have been inflicted intermittently over the course of the previous several weeks. I agree with the 2009 Board's conclusion that the murder 'by its very nature is just so horrible, the fact that this young child was basically dependent upon [defendant] for virtually every aspect of her existence, and [defendant] basically let this child down.' Indeed, [defendant's] actions demonstrated an exceptionally callous disregard for his daughter's life and suffering." (Italics added.) "I am also concerned that, although [defendant] says that he understands the circumstances that led to the crime and despite all of his participation in therapy and other programs in prison, he has still failed to obtain insight into the factors that caused his murderous conduct. During his incarceration, [defendant] offered varying and inconsistent explanations of the events that resulted in [the victim's] death." The Governor then set forth the various statements defendant made reflected in the probation report and the 2004 and 2008 psychological evaluations. The Governor then wrote, "Though the 2008 mental-health evaluator found that [defendant] appears to have an understanding of the underlying causes for his actions, he continued to describe the events leading to [the victim's] coma and ultimate death as 'accidental.' As recently as his 2008 parole consideration hearing, he continued to imply that her fatal injuries were somehow provoked due to her 'lack of balance.' [Defendant's] ongoing lack of insight renders the life crime still relevant to my determination that he continues to pose a current,

---

evidence found at the scene." (*Id*. at p. 213, italics added.) Similarly, as we will discuss, the record before us does not contain a "coherent account" by defendant in which he explained the injuries sustained by the victim.

unreasonable risk of danger to public safety because he cannot ensure that he will not commit similar crimes in the future if he does not completely understand and accept full responsibility for his actions."

In *Shaputis I*, the court found the defendant had failed to gain insight because "[e]vidence concerning the nature of the weapon, the location of ammunition found at the crime scene, and [defendant]'s statement that he had a 'little fight' with his wife support the view that he killed his wife intentionally, but…[defendant] *still* claims the shooting was an *accident*. This claim, considered with evidence of [defendant]'s history of domestic abuse and recent psychological reports reflecting that his character remains unchanged and that he is unable to gain insight into his antisocial behavior despite years of therapy and rehabilitative 'programming,' all provide some evidence in support of the Governor's conclusion that [defendant] remains dangerous and is unsuitable for parole." (*Shaputis I*, *supra*, 44 Cal.4th at p. 1260, original italics.)

We recognize that while the word "accidental" appears in quotes in the Governor's written decision as if defendant actually used that word, the record reflects that defendant never used the words "accident" or "accidental." However, defendant did use the word "negligent" to describe his actions. Specifically, as we have noted, when asked to describe why he thought his sentence was fair during the 2008 psychological evaluation, defendant said, "I did not get up in the morning and say that I wanted to take her life, but my behavior was *negligent* and I think I should stay in jail for as long as the sentence." (Italics added.) Given defendant's statement that his behavior was "negligent" and the overall description of the crime he gave to the psychologists, one could read defendant's description of what occurred on the day the victim was taken to the hospital after he purportedly tried to stand her up in the bathroom as a claim of accident.[12]

---

[12] The Governor also noted that at the 2004 hearing, "the Board asked [defendant] why [the victim's] balance was off, to which he stated that his daughter had been 'slow in

28

Defendant emphasizes that neither psychologist thought he lacked insight into the commitment offense. Rather, their opinions were that defendant had achieved insight. We do not ignore that evidence. As we have noted, the 2008 psychologist stated, "This examiner does not believe that the inmate placed blame on external or uncontrollable factors. He appeared to take responsibility for his actions." And the 2004 psychologist stated, "The inmate acknowledges he committed the offense. He fully acknowledges the wrongfulness of [his] actions. This inmate appears to take full responsibility for the offense and does not appear to rationalize or minimize his role.… This inmate appears to take full responsibility for his actions…." However, as we have noted, matters related to the weight to be given evidence is within the authority of the Governor, not this court. (*Shaputis II*, *supra*, 53 Cal.4th at p. 209.) And it is irrelevant whether we might determine that evidence in the record tending to establish suitability outweighs evidence demonstrating parole unsuitability. (*Id*.)

We note that the psychologist who performed the 2008 evaluation wrote the following in describing his own understanding of the commitment offense: "The essence of the offense involved the inmate grabbing the victim (his 20-month old daughter), which caused the victim to fall and to suffer a head injury leading to her death." We also note that the information about the pathologist's injury analogy (the victim's injuries were like those sustained by a person who has fallen off a multistory building or been ejected from a car), that the victim's injuries were the result of shaking, and defendant's

developing.' When the presiding commissioner suggested that [the victim's] poor balance might have been caused by the abuse and head trauma [defendant] inflicted upon her, he initially agreed. However, he later explained to his evaluator that her poor balance was attributable to her mother's use of crack cocaine when she was pregnant with [the victim]." The 2004 transcript was not made part of the appellate record by either party. We assume that defendant would have ensured the transcript was part of the record here if he thought it would be helpful. In any event, the Governor's notation of what defendant said at the 2004 proceedings is not necessary to our conclusion that his decision is based on "some evidence" of defendant's current dangerousness.

29

early admission that he shook the victim, does not appear in the probation officer's report. Perhaps as a consequence, the psychological examiners -- who relied solely on the probation officer's report for the facts underlying the commitment offense -- viewed the cause of the victim's death as having occurred in the bathroom on the day she was taken to the hospital. As a further consequence of the probation report omission, neither psychologist asked defendant about the description of the injuries provided by the pathologist or defendant's admission to the detectives that he shook the victim. Thus, neither psychologist factored the pathologist's description of the injuries into their evaluation of whether defendant was minimizing his conduct. Moreover, despite having admitted to a detective that he shook the victim, defendant never mentioned that fact to either of the two psychologists. Thus, defendant has never given a "coherent account" of how the injuries described by the pathologist were inflicted (see *Shaputis II*, *supra*, 53 Cal.4th at p. 213), and from the Governor's review of the accounts defendant has given, the Governor understandably concluded that those versions were inconsistent with the injuries.

In their original appellate briefing, the People make an additional argument concerning the injuries. Despite the Board's finding that the victim "died as a result of the injuries that had been inflicted upon her over a period of time" and her death was not the result of a "singular event" and the Governor's statement that the injuries were inflicted on multiple occasions, the People on appeal also rely on the prosecutor's statement to the probation officer that the attending physician had testified that the subdural hematoma "was a fast forming injury and most likely occurred just prior to the paramedics['] arrival." The People claim this opinion shows that the victim's fatal injuries were not caused by a mere fall to the bathroom floor; instead, the People infer that defendant had beaten the victim "just prior to the paramedics arriving at the house…." Thus, according to the People, the Governor could conclude that defendant lacks insight because he maintained that the victim died "as a result of her falling in the

30

bathroom--*despite evidence to the contrary*…." (Italics added.) We do not disagree with this observation, but note that defendant's decision to not discuss in more detail the specific conduct that resulted in the victim's injuries allows the Governor find that defendant previously abused the victim and the subdural hematoma was slow forming or conclude that defendant severely beat the victim the day she was taken to the hospital and her subdural hematoma was fast forming. Either way, the defendant's previous explanations to the psychologists omitting a "coherent account" that explains the victim's injuries provides "some evidence" of lack of insight. (*Shaputis II*, *supra*, 53 Cal.4th at p. 213.)

In his briefing and again at oral argument, defendant relies on *In re Palermo* (2009) 171 Cal.App.4th 1096, where this court concluded that discrepancies between the evidence and the defendant's version of the events did not indicate lack of insight because the defendant's version of the events was not physically impossible and did not strain credulity since his version was not "delusional, dishonest, or irrational." (*Id*. at p. 1112.) As the court in *In re Tapia* (2012) 207 Cal.App.4th 1104, 1113 observed, "[t]he rule of *In re Palermo* has been called into question by the Supreme Court's decision in *In re Shaputis*, *supra*, 53 Cal.4th at pages 214-215, in which the court held the record must be viewed in the light most favorable to the Board's decision, and that when 'the parole authority declines to give credence to certain evidence, a reviewing court may not interfere unless that determination lacks any rational basis and is merely arbitrary.' " The same holds true for decisions made by the Governor, and we cannot say that the Governor's determination here lacks a rational basis or is merely arbitrary.

At oral argument, defendant contended this case is like *Young*, *supra*, 204 Cal.App.4th 288. We disagree. *Young* is distinguishable because in *Young*, a case in which the Board denied parole, the Board *ignored* relevant statutory factors, including those related to the defendant's insight (*id*. at p. 305), and grounded its decision exclusively on the defendant's purported lack of insight. (*Id*.) In fact, the Board found

that the defendant lacked "*any* insights" into why he committed the commitment offense. (*Id*. at pp. 310-311, original italics.)  Contrary to that finding, the Court of Appeal observed there was significant evidence in the record which indicated the defendant did have insight.  (*Id*. at p. 309.)  The Court of Appeal concluded, "The Board's conclusion that [defendant] did not have *any* insights into why he committed the crime does not reflect [the] requisite due consideration and, given that it is not supported by the evidence, it is arbitrary, meaning that it is not supported by a modicum of evidence that is rationally indicative of current dangerousness."  (*Id*. at p. 312.)  The Board's decision also did not reflect "due consideration of several relevant statutory factors" beyond those regarding the defendant's "taking responsibility for the commitment offense," remorse, and insight, including the defendant "exemplary prison record, extensive rehabilitative programming, positive psychological evaluations, concrete parole plans, and significant support from family and friends."  (*Id*. at p. 293.)  The court of appeal concluded that "The Board's analysis does not reflect due consideration of all the relevant suitability factors and evidence, and rests largely on incorrect factual contentions and guesswork.  In our own review of the entire record, we have not found a modicum of evidence supporting the Board's analysis that is rationally indicative of current dangerousness." (*Id*. at p. 300.)

Here, the record reflects that the Governor did consider the evidence in defendant's favor, including that which reflects insight.  The evidence on insight is conflicting.  There is evidence defendant does have insight.  The Governor has pointed to and relied upon evidence indicating lack of insight.  We will not reweigh the evidence. "[I]t is not for the reviewing court to decide *which* evidence in the record is convincing." (*Shaputis II*, *supra*, 53 Cal.4th at p. 211, original italics.)

As our high court has made clear, the "some evidence" standard means a "modicum of evidence" supporting the determination that the inmate would pose a danger to the public if released on parole. (*Shaputis II*, *supra*, 53 Cal.4th at p. 214.)  And

we may reverse the Governor's decision "[o]nly when the evidence reflecting the inmate's present risk to public safety leads to but *one conclusion*…." (*Id.* at p. 211, italics added.) Here, we cannot say that the evidence regarding insight "leads to but one conclusion." There is "some evidence" defendant lacks insight as to the commitment offense and thus presents a current risk to public safety if released. (*Id*. at p. 219.)

### III.  Lack of Insight into Past Marijuana Abuse

The People argue that defendant's "lack of insight into his past substance abuse" provides some evidence of his current dangerousness when *"combined with other evidence in the record,"* specifically, defendant's "lack of insight into the offense." (Italics added.)  We agree.

### A.  Background

### Probation Report – Drug Use

The probation report stated that defendant "admitted drinking alcohol on occasion, denying excessive alcohol use.  He admitted smoking marijuana on occasion, but denied the use of any other type of illegal drugs or narcotics."

### 2004 Psychological Evaluation – Drug Use

The psychologist wrote, "The inmate described a pattern of moderate social alcohol use and some occasional experimentation with marijuana.  *He began smoking marijuana occasionally at age 13* and alcohol at age 13 also occasionally.  There was no drug of choice for him and he has not used any drugs or alcohol since 1993.  There is no record of any drug or alcohol abuse since entering prison.  The inmate has never participated in a drug or alcohol treatment program prior to his arrest.  Within the CDC the inmate has participated in both AA and NA, 1994 to 1995 participated in both NA and AA at Folsom in 1999 participated again in NA and AA at Ironwood and in 2001 to present has participated in NA at CVSP also he is currently the secretary of Narcotics Anonymous 2004."  (Italics added.)  As to the question of whether defendant has a

diagnosed substance abuse problem, the psychologist answered that question, "no." The psychologist opined that "[d]*rugs/alcohol did not play any role in the offense*."

### 2008 Psychological Evaluation – Drug Use

The psychologist wrote, "records indicate that the inmate has a positive history for the following substances: Alcohol and marijuana. When this examiner queried the inmate regarding his past substance use, he reported that he first began to use alcohol when he was '15' years old. It should be noted that document's [*sic*] in his C-File report that the inmate first began to abuse alcohol when he was '13' years of age.… In regards to marijuana, the inmate reported that he first began to abuse this substance [when] he was '14' or '15' years of age. It should be noted that records indicate that the inmate has previously stated that he began to abuse marijuana when he was '13' years of age. He reported to this examiner that he started smoking marijuana shortly after he began smoking cigarettes. He reported that *at his heaviest use he would smoke 'three joints in a day,* but not that much because my mom would have a tight grip on me.' The inmate reported that he last abused marijuana in the year of 1993 prior to the controlling offense." (Italics added.)

The psychologist noted an elevated score on one of the scales in one of the assessment tools he used to determine violence potential – "Lack of insight." As to this, the psychologist wrote, "In regards to lack of insight, the inmate displayed a lack of insight into the nature of his past abuse of marijuana. *Records indicate that the inmate has abused marijuana from at least the age of 14 and consumed approximately three marijuana cigarettes per day*. When [defendant] discussed his marijuana usage with this examiner, the inmate minimized the substantial nature of this past addiction and displayed poor insight into the fact that he was addicted to cannabis." (Italics added.)

In the section of the report related to "Overall Violence Risk," the psychologist wrote, "the inmate displayed poor insight into the substantial nature of his past marijuana usage. In discussion with this examiner, [defendant] noted that he did not believe that he

34

was ever addicted to marijuana. *This is concerning in that records clearly document that the inmate was abusing at least three marijuana cigarettes on a daily basis prior to his incarceration.* It is imperative that the inmate gain more insight into the fact that his past marijuana usage was substantial and could potentially impact him when placed back into the community." The psychologist opined that defendant's "poor insight into the substantial nature of his past marijuana usage" was a deficit area that "may increase the inmate's risk to violently recidivate." (Italics added.)

The psychologist did acknowledge defendant's efforts in dealing with his substance abuse problems, writing that "[a]lthough the inmate minimized the importance of his past cannabis usage, he should be commended for his continual attendance in Narcotics Anonymous for at least four straight years."

### Defendant's Statements at the Parole Hearing
### Regarding Marijuana Use

Defendant did not deny using marijuana in the past, but stated he was not drunk or under the influence of marijuana at the time of the commitment offense. When questioned about the psychologist's report and how his use of marijuana and alcohol impacted his state of mind or his view of the world, defendant replied, "Well, I was already an unstable person, and I think that the use of alcohol and marijuana contributed to that instability even further. I was already a person who was frustrated with life, frustrated with the fact that, you know, I made a lot of bad decisions, frustrated that I was a bad parent. You know, I was frustrated from…the beginning, from the death of my grandmother is when it all began, and I…just built on that. I withdrew from life. I created…problems for my mother, and…it contributed to the unstable person that I already was."

35

## B. Analysis

The Governor relies on the portion of the 2008 psychologist's discussion of defendant's marijuana abuse – specifically that defendant did not believe he was ever addicted to marijuana.

The 2008 psychological evaluation stated at the outset, under "Sources of Information," that defendant's "Central File (C-File) and Unit Health Record (UHR) were reviewed. This review included a full psychological report on [defendant in 2004] for the Board of Parole Hearings…." However, the psychologist did not identify the specific records from which he obtained information concerning defendant's marijuana use.

Faced with the same dilemma, the trial court stated, "It appears that the 'records' that the [2008 mental health evaluator] relied upon" were "[defendant's] self-report that he began to abuse marijuana when he was approximately 13 years old, and that at his *heaviest* use, he would smoke three joints a day, but usually not that much because of parental controls."

The trial court's conclusion is supported by the 2004 mental health evaluation which, like the 2008 evaluation, was based in part upon defendant's "C-file and medical records" but made no mention of any "records" that indicated defendant was using at least three marijuana cigarettes on a daily basis prior to his incarceration. Rather, as we have noted, the 2004 evaluation stated that defendant "began smoking marijuana occasionally at age 13 and [drinking] alcohol at age 13 also occasionally."

We also note that when defendant was asked at the parole hearing about the 2008 report reference to his marijuana use, he replied that the "heavy drug use when I was younger when I first started, you know, around like the seventh grade or something, so between 13 and 14 years old. That's when the bulk of that happened, and then it was like off and on, you know, up until I came to jail." Consistent with his testimony at the parole

36

hearing, when interviewed by the probation officer years earlier, defendant "admitted smoking marijuana on occasion."

We cannot determine whether the 2008 psychologist rested his conclusions upon matters that were adequately demonstrated in the records assembled for the evaluation. While the present record suggests a misinterpretation of statements made by defendant, "it is not for the reviewing court to decide *which* evidence in the record is convincing." (*Shaputis II*, *supra*, 53 Cal.4th at p. 211.) Moreover, the 2008 psychologist's opinion was also based on an elevated score on an insight scale in one of the psychological assessment tools he employed.

Accordingly, based on the record before us, the 2008 psychologist's opinion, in combination with defendant's lack of insight[13] as to the commitment offense, provided "some evidence" to support the Governor's conclusion as to defendant's current dangerousness.

---

[13] We note that the mere risk of substance abuse relapse can never be entirely eliminated and cannot itself warrant the denial of parole, because if it did the mere fact that a defendant was a former substance abuser would forever justify a decision that the defendant is unsuitable for parole. (*In re Stoneroad* (2013) 215 Cal.App.4th 596, 625.)

## DISPOSITION

The trial court's order granting the writ of habeas corpus is reversed.  The trial court is directed to enter a new order denying writ relief.  The Governor's decision reversing the decision of the Board is reinstated.

                                                              MURRAY , J.

We concur:

    NICHOLSON, Acting P. J.

    BUTZ , J.