Filed 4/30/14  Certified for publication 5/21/14 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re CHESTER N. LEBLANC on Habeas Corpus. | A139769 <br><br> (Alameda County <br> Super. Ct. No. 70098) |

Petitioner Chester N. LeBlanc challenges the Governor's denial of his parole. Petitioner received a life sentence for the 1980 fatal stabbing of his domestic partner's two-year-old son.  The Governor denied parole because he found petitioner's explanation for the crime to be superficial and was concerned about petitioner's continuing mental health problems.  Because we find some evidence to support the Governor's conclusion that petitioner continues to present a risk of danger if released, we deny the requested writ of habeas corpus.

## I.  BACKGROUND

Petitioner, 24 years old at the time, pleaded guilty in 1980 to second degree murder after he fatally stabbed a two-year-old boy.  Petitioner was living with Brigid Williams and her two children.  He was the father of the younger child, a daughter, but the older child, the stabbing victim, was not his child, despite being named Chester LeBlanc, Jr. (Chet, Jr.).  Domestic violence was a regular feature of the relationship; petitioner later acknowledged abusing Williams "on a weekly basis."  Less than a week before the murder, he had thrown Williams into a closet, nailed the door shut, and "hidden" their daughter, before eventually releasing Williams.

Late in the afternoon on the day of the murder, petitioner and Williams were in their bedroom. Defendant, who had been drinking, demanded to have sexual intercourse with Williams. When she refused, he threatened to " 'get a knife and cut your vagina out.' " Afraid, Williams submitted to rape. Afterward, defendant accused Williams of infidelity. He pulled a butcher knife from his sock and began cutting off her hair, in the process leaving large gashes in her scalp. After a struggle, Williams escaped upstairs to her sister's apartment, who then called the police. When the officers arrived at petitioner's apartment, he refused to admit them. In response to their inquiry about the children, he said, " 'They won't be okay, if you come in.' " By the time the officers forced open the locked door, Chet, Jr. had already suffered the fatal wound. At the time of his conviction, petitioner claimed the stabbing was an accidental result of the police action, but by the time of his most recent parole hearing in 2012, he acknowledged intentionally stabbing Chet, Jr. in the chest as the police were banging down the door. For this crime, petitioner was sentenced to a term of 15 years to life in prison. He has been incarcerated ever since.

By the time of his appearance before the Parole Board (Board) in October 2012, petitioner was nearly 57 years old. He suffered from a number of health problems, including heart and lung conditions that had required surgical intervention. For the prior several years, he had been a model prisoner, and he is well regarded by prison officials and employees.[1] Petitioner had arranged to stay at a half-way house if released, and he demonstrated fairly regular contact with sisters and other family members who were ready to support his efforts to live independently. Petitioner has developed some job skills while in prison, and he planned to stay active in substance abuse programs such as Alcoholics Anonymous.

---

[1] Two months before his parole hearing, petitioner was stopped by a prison guard after he removed a tablet of prescription morphine from his mouth and placed it in his pants pocket. Following a hearing, he was found guilty of possession of a controlled substance. The Board appears to have accepted petitioner's innocent explanation for the incident, and the Governor did not cite the incident in reversing the Board. We do not consider the incident in reviewing the Governor's denial of parole.

In discussing his commitment crime, petitioner straightforwardly acknowledged and discussed his conduct and culpability. He expressed unqualified remorse, saying he "made those choices myself," did not "blame [Williams] for anything," and took "full responsibility for my actions." He had concluded his violence against Williams and Chet, Jr. was the result of a violent childhood family life, his alcohol and drug abuse, a "selfish and self-centered" and "insecure" personality, and the fear of losing the family he had built with Williams. He said he "dealt with [that fear] in the only way I knew how," using violence in an attempt to control Williams. After an extensive analysis of petitioner's circumstances, the risk assessment prepared by a psychologist in connection with his parole hearing rated him a "*Low* or non-elevated risk of violence."

The Board granted parole, noting that although the commitment offense was "particularly horrible, offensive, and cold," petitioner had "addressed the drug and alcohol issues," and "the positive aspects of your case heavily outweigh the other considerations . . . ."

The Governor reversed the decision. His decision "acknowledge[d] Mr. LeBlanc has made efforts to improve himself while incarcerated," citing in particular petitioner's acquisition of trade skills and participation in substance abuse programs. The Governor was concerned, however, that petitioner "has failed to sufficiently explain why his history of domestic violence against Ms. Williams ultimately culminated in his stabbing a toddler." The decision noted that being self-centered was a "shallow explanation" for killing a child, while being a victim of child abuse "does not adequately explain" why he suddenly chose to kill Chet, Jr. The Governor was also concerned that petitioner could not "better articulate the reasons for his pattern of violence towards Ms. Williams," saying it was "nonsensical" to believe "abusing Ms. Williams would keep their family together." Finally, the Governor was "troubled by Mr. LeBlanc's history of mental instability," including recent instances of depression. After noting he had "considered the evidence in the record that is relevant to whether Mr. LeBlanc is currently dangerous," the Governor concluded, "[T]he evidence I have discussed shows why he currently poses a danger to society if released from prison."

3

After the superior court denied a petition for a writ of habeas corpus seeking review of the denial of parole, petitioner filed a pro se petition in our court in September 2013. We entered an order to show cause and appointed counsel to represent him.

## II. DISCUSSION

The "awesome responsibility" of deciding whether to release a convicted murderer on parole "lies with the executive branch, not the judicial branch." (*In re Lawrence* (2008) 44 Cal.4th 1181, 1230 (dis. opn. of Chin, J.) (*Lawrence*).) The Board's and the Governor's " 'discretion in parole matters has been described as "great" [citation] and "almost unlimited" [citation].' " (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 655.)

Under Penal Code section 3041, a prisoner eligible for parole must be granted parole unless the Board or the Governor concludes "the public safety requires a more lengthy period of incarceration." (*Id.*, subd. (b).) Title 15, section 2402 of the California Code of Regulations, which governs a prisoner's suitability for parole, lists a variety of factors to be considered in evaluating a prisoner's suitability for parole, including the heinousness of the crime, psychological factors, institutional behavior, signs of remorse, age, and understanding and plans for the future. (*Id.*, subds. (c)(1), (5), & (6), (d)(3), (7) & (8).)

While we have the authority to review a decision of the Board or the Governor denying parole to an eligible prisoner, our review is confined to ensuring the prisoner was afforded due process of law in the consideration of his or her application. (*Lawrence, supra,* 44 Cal.4th at pp. 1204–1205.) This entails ensuring the Board's or the Governor's decision "reflects 'an individualized consideration of the specified criteria' and is not 'arbitrary and capricious.' " (*Id.* at p. 1205.) The latter consideration, a measure of the substantive merit of the decision, is satisfied if the record contains "some evidence that the inmate remains a current threat to public safety." (*Id.* at p. 1206.)

The "some evidence" standard is "*more deferential* than substantial evidence review, and may be satisfied by a lesser evidentiary showing." (*In re Shaputis* (2011) 53 Cal.4th 192, 210.) "[U]nder the 'some evidence' standard, '[o]nly a modicum of

4

evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of [the Board or] the Governor. . . . [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of [the Board or] the Governor . . . . It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. . . .' [Citation.] [¶] . . . [¶] . . . Only when the evidence reflecting the inmate's present risk to public safety leads to but one conclusion may a court overturn a contrary decision by the Board or the Governor." (*Id.* at pp. 210, 211.) In determining whether a decision is supported by some evidence, we are not limited to the evidence actually mentioned by the Board or the Governor in their decision denying parole. (*Id.* at p. 214, fn. 11.) That said, the aggravated nature of the commitment crime alone does not provide such evidence "unless the record also establishes that something in the prisoner's pre- or postincarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety." (*Lawrence, supra*, 44 Cal.4th at p. 1214.)

We conclude the Governor's decision is supported by some evidence that petitioner remains a current danger if released. As the Governor noted, petitioner has not provided an adequate explanation for the murder that led to his incarceration. While he appears to understand the psychological dynamics behind his terrorizing of Williams— insecurity expressed through intimidating violence, an approach he learned from his father—the decision to murder Chet, Jr. was an entirely different sort of act.

Before the Board, petitioner tended to treat the murder as an extension of the domestic violence he directed against Williams. When asked to justify it separately, he begged off, saying, "There's no reason that anyone can come up with for taking the life of a two-year-old." Pressed, petitioner told the Board, "Well, I've seen that I was abused and I treated this child the same way my parents treated me." As the Governor suggested, neither explanation satisfies. The first is a truism, not an explanation. It is a

5

means to avoid an explanation. The second rings false. Petitioner claimed never to have abused Chet, Jr. in the day-to-day manner he had been abused by his father. Further, the sudden and unprovoked stabbing was of a different order entirely from the type of abuse that had been directed at petitioner in his childhood. Petitioner's lack of insight into the cause of his commitment crime, and his attempt to avoid grappling with it by mixing it with the manipulative violence directed against Williams, provides some evidence of continued, present dangerousness. (See *Shaputis, supra*, 53 Cal.4th at pp. 219–220.)

We note that petitioner's murder of Chet, Jr. appears to have been the result, not of insecurity over his relationship with Williams, but of an unreasoning, literally murderous rage, undoubtedly enhanced by the well-known effect of alcohol in lowering inhibitions.[2] Before the Board, petitioner acknowledged his continuing struggle to control his anger: "It can come on and it's sparked up if I'm thinking negative and through my—going through the day, if I dwell on certain things and someone says something to me that I don't agree with, then I'll get angry. I understand that I have these anger problems. And today, what I do is I step back, take a deep breath. [¶] . . . [¶] And there are other things that I can do." The psychologist who prepared the risk assessment noted petitioner "acknowledged that he continues to struggle with managing his anger in a constructive manner, maintaining an open and clear mind, and focusing on being slow to anger." Petitioner's acknowledgment of his temperament may be the first step in anger control, but the Governor was not required to take the risk that petitioner would succeed in controlling it, particularly since, as the Governor noted, petitioner continues to struggle with occasional depression.[3]

---

[2] Petitioner did tell the evaluating psychologist that he "has discovered that his behavior was rooted in anger and insecurity." Since petitioner did not repeat this explanation to the Board, we cannot conclude he has internalized it, particularly the role of rage in his killing of Chet, Jr.

[3] Petitioner had attempted suicide prior to the commitment crime and twice while in jail after the crime. He sought mental health treatment in 2007 for symptoms of depression associated with his medical and family issues, again in 2010, and again in

6

Petitioner argues the Governor's decision failed to consider his age and poor health as factors in favor of suitability. While the Governor is required to engage in " 'an individualized consideration of the specified criteria' " (*Lawrence, supra*, 44 Cal.4th at p. 1205), it has never been held that the Governor's decision must address individually each factor in section 2042 of title 15 of the California Code of Regulations. The Governor's decision stated he had "considered the evidence in the record that is relevant to whether Mr. LeBlanc is currently dangerous," and we have no reason to doubt that statement. The decision reflects a careful consideration of petitioner's individual circumstances, which is sufficient. Further, neither petitioner's age nor his health problems were of sufficient magnitude as to prevent him from engaging in violent conduct. While in prison, petitioner had taken a wife, and while the couple has "separated," they remained legally married. In addition, petitioner anticipates the possibility of developing a romantic relationship if released. The risk of domestic violence remains, particularly if petitioner's commitment to sobriety lags.

---

2011, for a "Mood Disorder." Petitioner continued to take an antidepressant medication at the time of his parole hearing.

## III. DISPOSITION

The petition for writ of habeas corpus is denied.

_____
Margulies, Acting P.J.

We concur:


_____
Banke, J.


_____
Becton, J.*

---

* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re CHESTER N. LEBLANC on Habeas Corpus. | A139769<br><br>(Alameda County<br>Super. Ct. No. 70098)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

      The opinion in the above-entitled matter filed on April 30, 2014, was not certified for publication in the Official Reports.  After the court's review of a request under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.

Dated:

_____

Margulies, J.

Trial Court:   Alameda County Superior Court

Trial Judge:   Hon. Larry J. Goodman

Counsel:

Jonathan Soglin and Frances Marie Ternus, under appointment by the Court of Appeal, for Appellant.

Kamala D. Harris, Attorney General, Jennifer A. Neill, Assistant Attorney General, Claudia H. Amaral and Amanda Lloyd, Deputy Attorneys General for Respondent.