Filed 6/17/15  In re Brodheim CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re MICHAEL BRODHEIM,<br><br>on Habeas Corpus. | A141314<br><br>(Alameda County<br>Super. Ct. No. 72318) |

## I.

## INTRODUCTION

Michael Brodheim, a state prison inmate serving a life term for the 1981 murder of Kristin Malmquist, petitions for a writ of habeas corpus seeking to overturn Governor Edmund G. Brown Jr.'s (the Governor) June 7, 2013 reversal of the grant of parole by the Board of Parole Hearings (the Board).  This is the second time the Governor has reversed the Board's grant of parole to petitioner.  The Governor denied parole on this occasion, referring to his earlier reversal of the Board's 2012 grant of parole on the basis of the "heinous nature of the crime and because Mr. Brodheim lacked insight, had a rather selective memory of his actions, and has continued to exhibit many of the same traits that led him to murder.  Mr. Brodheim's statements since then have not changed significantly and my concerns remain."  The Governor found that petitioner currently poses an unreasonable danger to society if released.  He based that determination primarily on what he found to be petitioner's "muddled" explanation of *why* he had sex with Kristin's body after she was murdered and his view that petitioner's unresolved childhood feelings

1

of vulnerability and fears of abandonment did not adequately explain his meticulous, obsessive plotting of Kristin's murder after only a few months of dating her.

Petitioner contends the Governor's reversal lacked any supporting evidence and was otherwise arbitrary and capricious, in violation of petitioner's federal and state constitutional rights to due process. We shall conclude that the Governor's reversal is not supported by "some evidence." (*In re Lawrence* (2008) 44 Cal.4th 1181, 1204, 1206 (*Lawrence*).)

## II.

## BACKGROUND

Petitioner was born in Israel and immigrated with his family to the United States when he was four years old. He is the middle of three children. Petitioner's parents had a tumultuous relationship, and petitioner avoided the conflict and particularly his mother's anger by focusing on academic success. When petitioner was 14, the family moved to the Philippines where his father had taken a job. His parents separated six months later and his mother returned to the United States, leaving petitioner and his siblings with their father in the Philippines. Petitioner resided in the Philippines until he graduated from high school. At that time he returned to the United States to attend the Massachusetts Institute of Technology (MIT) with a double major in physics and math. Petitioner received his degree in physics from MIT. In 1981, at the time of the life-crime, he was a 22-year-old graduate student, pursuing a Ph.D. in physics at the University of California, Berkeley (UC Berkeley).

### A. Harassment of Former Girlfriend

Before his involvement with Kristin, petitioner met a young woman while he was in high school in the Philippines whom we will refer to as the (or his) former girlfriend. They developed a deep friendship, although he maintained their relationship never progressed sexually beyond kissing while in high school. After graduating, both attended college in the United States, with the former girlfriend attending college near MIT. In the second semester of their sophomore year, she began to distance herself from petitioner. During petitioner's junior year at MIT, the former girlfriend was taking classes at MIT,

but was not spending time with him and was not telling him what was going on. He moved from "feeling confused" to "beginning to feel this rage." He began making phone calls to her and then hanging up without speaking. In addition to the phone calls, he recalled putting up a poster near her class at MIT with the message, "For a good time, call . . . ." During one phone call, he threatened to kill her. She reported it and he was banned from her campus for a time. He became increasingly agitated and unable to study and increasingly unable to deal with the breakup. He took the semester off and, at his mother's insistence, began seeing a psychologist. He went a "handful of times" and mainly talked about how unfair the former girlfriend was and how she led him on.

### B. The Commitment Offense[1]

Petitioner met Kristin while he was a graduate student, and she was an undergraduate at UC Berkeley. They began dating during the fall quarter of 1980. At Thanksgiving, Kristin had introduced him to her parents. Sometime around Christmas, however, she believed the relationship was becoming too serious, so she brought it to an end. During February 1981, Kristin started to receive annoying phone calls. She told others about the calls and, at her mother's suggestion, reported the calls to the Berkeley Police Department. During the last week of February, petitioner contacted Kristin, claiming that his mother had suffered a heart attack and that he needed to speak with and be helped by her. A few days later, he told Kristin that his mother had died. In truth, his mother was in good health and his calls were a ruse to see Kristin and to cause her to feel sorry for him.

During the same week, petitioner arranged to buy a .38-caliber revolver from a gun dealer on College Avenue in Berkeley. He told the gun dealer that his apartment had been broken into and burgled, and that his girlfriend had been raped. He was told he would have to wait 15 days before he could take delivery of the gun. The next day he

---

[1] Our summary of the facts of the commitment offense (also referred to herein as the life offense or life crime) is taken from our nonpublished appellate opinion in *People v. Brodheim* (Sept. 24, 1987, A018940) and from the probation report attached as an exhibit to the Return to Order to Show Cause filed in this case by the Attorney General.

3

went to a sporting goods store and purchased a knife. He was somewhat confused as to whether the purpose was for suicide or homicide, or both. On the morning of Saturday, February 28, 1981, Kristin spoke with her parents on the telephone and told them that "Mike is coming by because his mother died and I need to help him because he doesn't want to go to the funeral."

On Monday, March 2, Kristin's bloody body was found lying on the floor inside her apartment. The cause of death was "asphyxiation due to strangulation associated with multiple blunt injuries." Injuries to her neck were consistent with strangulation inflicted by hand. In her hip area were signs of trauma consistent with what would be caused by heat and smoke. Physical evidence, including a broken champagne bottle and petitioner's wallet and driver's license, were recovered from the scene. Petitioner admitted he walked to Kristin's apartment, stopping to purchase lighter fluid, nonprescription sleeping pills, and champagne. He knocked on her door and after she let him in, he sat on the couch by himself drinking champagne. Kristin was studying at the kitchen table. There was little conversation. She asked if he was going back East to his mother's funeral and when he said no, she said "I don't understand you." He thought about killing himself and after finishing the champagne, he considered killing her. He went into the kitchen, stood behind her, and brought the bottle down on her head. Her nose began bleeding and she slumped to the floor, at which point he strangled her. Petitioner then ingested the entire package of nonprescription sleeping pills and attempted to slash his wrists with a razor blade (most of the blood found in Kristin's apartment was consistent with that of petitioner, rather than Kristin). He tried to light a quilt covering the two of them, but it burned slowly and then went out. He left the apartment and then fell or jumped from a freeway overpass, resulting in a skull fracture and a broken collar bone. He was found and hospitalized on March 1.

On March 4, petitioner was located by police at Highland Hospital in Oakland and was placed under arrest for Kristin's murder. While hospitalized, petitioner made three statements to law enforcement authorities, one of which was tape recorded. Petitioner admitted he had made annoying phone calls to Kristin during the preceding week and that

4

he had gone to her apartment on the ruse that his mother had died. He also acknowledged buying the gun to kill himself "and maybe . . . Kris, too." He admitted he killed Kristin by first hitting her with the champagne bottle and then choking her until she stopped moving. During one of the interviews, he also admitted that he completed an act of sexual intercourse with the corpse. He then attempted to set fire to her body with some lighter fluid he had just purchased.

Following a jury trial, petitioner was convicted of first degree murder. The jury also found he did not personally inflict great bodily injury on the victim with the intent to inflict such injury. (Pen. Code, §§ 187, 1203.075.) Petitioner was sentenced to state prison for a term of 25 years to life. We affirmed the judgment in an unpublished opinion on September 24, 1987. (*People v. Brodheim*, *supra*, at p.*1.)

### C. Parole Suitability Hearings and Governor's Decisions

On November 1, 2010, a federal district court ruled petitioner's 2003 parole denial was not supported by "some evidence" of current or future dangerousness, and granted him habeas relief. The district court's decision was appealed, and while that appeal was pending, in compliance with the district court order, the Board held a parole hearing on December 1, 2010. The Board granted petitioner parole. Thereafter, the Ninth Circuit Court of Appeals reversed the district court's grant of habeas relief, pursuant to *Swarthout v. Cooke* (2011) 562 U.S. 216 (*per curiam*), holding that parole denials are not reviewable unless there is a federal right at stake and that "responsibility for assuring that the constitutionally adequate procedures governing California's parole system are properly applied rests with California courts . . . ." (*Id.* at p. 222.) The Board then reversed its tentative parole grant, stating the Ninth Circuit's decision had the legal effect of vacating the Board's December 1, 2010 grant of parole.

### 1. *January 11, 2012 Board Grant of Parole and Governor's Reversal*

Petitioner's next parole hearing was held in January 11, 2012. At that hearing, the Board concluded petitioner was suitable for parole. The Governor reviewed the Board's decision on June 8, 2012, and reversed the grant of parole. The superior court denied petitioner writ relief on November 16, 2012, finding, among other things, that "some

5

evidence" supported the Governor's finding of unsuitability.  Quoting the Governor's June 8, 2012 letter reversing the Board's grant of parole, the superior court concluded: "Petitioner's 'inability to recall having sex with the victim's corpse was inconsistent with the level of detail he was able to provide about other aspects of the murder' . . . shows . . . a lack of insight and provides some evidence he remains a danger to society."  The court also found some evidence supported the Governor's finding that petitioner's explanation for the murder was unconvincing and that he continued to exhibit traits that led him to murder.  This court also denied petitioner's habeas corpus petition from the Governor's June 8, 2012 reversal of the Board's decision.

### 2. *January 8, 2013 Board Grant of Parole*

On January 8, 2013, the Board held a new parole hearing.  At the time of this parole hearing, petitioner was 54 years old and had served about 32 years.  At the conclusion of the lengthy hearing, the Board again found petitioner suitable for parole. The Board had before it voluminous records, letters and reports, including psychological reports and risk assessments, as well petitioner's testimony and the prior testimony of the victim's sister, who was unable to attend the hearing, but who opposed parole.

### a.  Psychological Records and Risk Assessments

The record contains several psychological and risk assessments.  All assessments concluded petitioner represented a low risk for future violence.[2]  The assessments observed that petitioner had been diagnosed shortly after the life crime with Borderline Personality Disorder, but that subsequent evaluations had determined such was no longer the case.  In response to a directive from the Board, in January 2009, California

---

[2]  A May 2009 risk assessment prepared at the request of petitioner's counsel provides additional background.  The evaluator, Barbara E., McDermott, Ph.D., reviewed previous evaluations, noting that petitioner "has had at least 13 psychological evaluations and numerous life prisoner evaluations since his incarceration.  In every evaluation, reference was made to Mr. Brodheim's commendable programming and described his violence risk as 'lower than the average inmate.'  In addition, all evaluations make reference to the extensive treatment that Mr. Brodheim has received, which included eight years of individual psychotherapy.  Dr. Nakagawa, his individual therapist, described Mr. Brodheim as 'highly motivated in therapy.' "

Department of Corrections and Rehabilitation (CDCR) staff psychologist Dr. Kotila wrote an informational chrono[3] regarding an assessment of psychosexual concern regarding petitioner. Dr. Kotila noted, "Based on this inmate's behavior over the last three years, there is no empirical evidence of ongoing unresolved psychosexual problems requiring treatment."

The assessment closest in time to the January 8, 2013 parole hearing was that dated November 19, 2012, by private forensic psychologist Melvin Macomber, Ph.D. Before that, the most recent evaluation was the "Subsequent Risk Assessment" dated November 1, 2012, by CDCR forensic psychologist Jatinder K. Singh, Ph.D. Dr. Singh had also conducted a similar risk assessment of petitioner in November 2011, and had prepared a report for the previous parole hearing. These risk assessments updated the "Comprehensive Risk Assessment" authored by Lisa Kalich, Psy.D., dated April 2, 2009.

In her April 2, 2009 assessment, Dr. Kalich concluded in her overall risk assessment that "[a]fter weighing all of the data from the available records, the clinical interview, and the risk assessment data, it appears that Mr. Brodheim presents a relatively low risk for violence in the free community." Dr. Kalich's assessment utilized a number of instruments to evaluate this risk. The instrument designed to evaluate levels of risk for general recidivism placed petitioner in the lowest two percent of the inmate population. The "Psychopathy Checklist-Revised" (PCL-R) placed petitioner "in the 8th percentile among North American male offenders, meaning 92 [percent] of adult male offenders scored higher on this instrument." While Dr. Kalich found "some level of endorsement" for certain traits, i.e., "Glib/Superficial Charm, Grandiose Sense of Self Worth, Conning/Manipulative, Lack of Remorse or Guilt, Shallow Affect, Lack of Empathy, Poor Behavioral Controls, Lack of Realistic Long-Term Goals, Impulsivity, [and] Failure to Accept Consequences for Own Actions," she emphasized that these items "must take into account both the lifetime history of the individual as well as recent behavior." Since

---

[3] "A 'chrono' is an institutional documentation of information about inmates and inmate behavior. (See Cal. Code Regs., tit. 15, § 3000 [definition of 'General Chrono']. . . ." (*In re Stoneroad* (2013) 215 Cal.App.4th 596, 606, fn. 4 (*Stoneroad*).)

7

his incarceration, petitioner was described as being "invested in gaining and practicing empathy for others," as demonstrating good behavioral control except for one rule violation, and as having characteristics "suggestive of impulsivity" and of narcissistic traits. Dr. Kalich's report also observed that when discussing the life crime, petitioner's "level of intellectualization is striking."

Dr. Kalich also administered a "STATIC-99" assessment, designed to assist in the prediction of sexual or violent recidivism. Application of that instrument rated petitioner as falling "within the medium-low risk category of future sexual offense . . . based on his past history of sexually related and non-sexually related convictions." Based on the "Historical, Clinical, Risk Management-20 instrument," however, Dr. Kalich concluded petitioner was in the "low risk category" for violent recidivism.

More recent assessments by Drs. Singh and Macomber acknowledged Dr. Kalich's observation in 2009 that petitioner "displayed good insight into his past behaviors," but that "much of this discussion was on an intellectual rather than emotional, level." The Subsequent Risk Assessment conducted by Dr. Singh in November 2012 observed that petitioner had recognized and worked on these issues. According to Dr. Singh, petitioner's "insight and self-awareness, particularly regarding his emotional life, appeared to have grown tremendously with treatment. In more recent years he worked on empathy in groups (Alternatives to Violence Project-AVP and Pastoral Care Services-PCS) and spiritual issues in Jewish and Buddhist studies. In 2011[,] Mr. Brodheim viewed himself as 'more optimistic' than in the past and believed this was why he was no longer depressed."

In his 2012 Subsequent Risk Assessment, Dr. Singh noted that "[a] sincere remorse for his actions has been noted by prior evaluators." Dr. Singh reported that petitioner had come to realize that "he attempted to apply logic rules (learned studying science and math) to his personal life. For instance, he believed 'If I behaved according to the rules, I should be treated a certain way' and then inferring 'if I wasn't the problem, (it must) lie with you.' In his youth, he failed to recognize this was a very self-centered approach. Through treatment in prison he has accepted that the root of his problems was

8

his inability to handle conflict in a mature manner. He was absolutely clear . . . that these problems did not originate with either Ms. Malmquist or [his former girlfriend], but rather himself. By observing his parents, his model for conflict resolution, he learned to avoid conflict and thus problems were never resolved. Because of his inexperience with emotions, he had difficulty recognizing how to solve problems within relationships and move on. He admitted that although he attended therapy following the breakup with [his former girlfriend], his dishonesty with the therapist prevented him from confronting these issues directly. He was only able to recognize these problems and make changes during his incarceration. As he did in the 2011 [Subsequent Risk Assessment], Mr. Brodheim stated . . . that his [Alternatives to Violence Program] groups were the most useful; allowing him [to] recognize and begin work on his emotions."

Dr. McDermott's 2009 psychological evaluation noted that petitioner "was able to discuss his crime and exhibited insight into the factors that led to the commission of his offense. He did not present in an over-intellectualized fashion. It is true that Mr. Brodheim is quite bright and well-educated and as such, is very articulate. However, being able to articulate issues and conflicts with the three primary female relationships from his past (his mother, [his former girlfriend,] and Ms. Malmquist), does not equate with intellectualization." Dr. Macomber's November 19, 2012 assessment agreed that petitioner's "ability to articulate his conflicts with women in the past did not indicate that he used intellectualization as a defense, as alleged by prior evaluators."

Drs. Macomber and Singh reiterated Dr. Kalich's recognition that her observations of narcissistic features and a lack of empathy were based on a diagnoses of Borderline Personality Disorder made shortly after the life crime. Dr. Singh noted "subsequent evaluations noted these features were resolved with treatment." "During his incarceration he has developed the ability to empathize with others, an ability that was not present in the past." Dr. Singh observed that Dr. Kalich's 2009 notation that petitioner's parole plans appeared somewhat "grandiose " no longer applied, as petitioner had adjusted his parole plans and that his parole plans in 2012 appeared "considerably more realistic and appropriate." Dr. Macomber agreed, pointing out, as Dr. Kalich had recognized, that the

9

"PCL-R scoring is based upon the lifetime behavior of the inmate. . . . The litany of undesirable traits that the psychologist (Dr. Kalich) listed refers back to [petitioner's] actions thirty years ago in the commitment offense. They certainly do not reflect his current thinking and values, as shown by that very evaluation as well as his more recent evaluations. In context, those findings did not signify dangerousness; for the evaluator gave him a very low score based on these and her other findings." Dr. Macomber also concluded that Dr. Kalich's 2009 finding of some current narcissistic traits was "stale[,] as none of the more recent evaluators had found evidence of such a trait," that any such trait petitioner exhibited in 2009 had dissipated, and that psychological tests administered in November 2012, "did not show any evidence of a narcissistic orientation nor did [Macomber] see any such evidence." Further, Macomber opined that "[m]ost individuals have some narcissistic traits or some other personality traits, but in and of itself a trait is not evidence of dangerousness. A personality trait must be distinguished from a personality disorder in this regard."

### b. Board Findings

Petitioner has been model prisoner and appears to be a changed man. At the hearing before the Board, petitioner testified at length, as he had before, about the issues that he believed had led him to commit the life crime, as well as about his previous harassing behavior toward his former girlfriend following their breakup.

The Board found that petitioner "does not pose an unreasonable risk of danger to society or a threat to public safety and is therefore eligible for parole. This decision does not diminish the fact that the life crime committed by Mr. Brodheim was especially gruesome and horrific. His actions resulted in the death of Ms. Malmquist and his reasons for committing the offense in no way justif[y] his actions. However, the California Supreme Court has ruled that after a long period of time, immutable factors such as the commitment offense may no longer indicate a current risk of danger to society in light of a lengthy period of positive rehabilitation."

The Board also found many of the circumstances tending to show suitability pursuant to title 15, section 2402 of the California Code of Regulations were present,

10

including: petitioner's lack of a prior violent criminal history; his dysfunctional family history (mainly concerning his relationship with his mother, who committed suicide in 1988); strong support from his remaining family members; his remorse and acceptance of responsibility for his criminal actions; his age, reducing the probability of recidivism; his engagement in institutional activities indicating an enhanced ability to function within the law upon release; a prison record virtually free of discipline (his only RVR 115 was 15 years before for lack of respect)[4]; numerous laudatory chronos; and his realistic plans for release and for support thereafter. These latter circumstances included petitioner's having found a therapist who was willing and able to see him as he transitioned from prison, his marketable skills as a paralegal and job offers from an attorney, as well as viable residential plans.

Further, all assessments found him to be at a low risk of reoffending. The Board recognized that the Comprehensive Risk Assessment administered by Dr. Kalich rated him as a low risk to reoffend and that the Static-99 test that rated him as medium-to-low risk was based on historical factors, including the life crime. Dr. Singh's Subsequent Risk Assessments mitigated Dr. Kalich's already low finding. The Board discounted to a large extent the report of petitioner's privately retained expert, Dr. Macomber, finding it contained inaccuracies, such as the statement that petitioner had no history of impulsive behavior or lack of behavioral control before the life crime.

During the hearing, the Board reviewed the Governor's previous 2012 parole reversal and discussed with petitioner, at length, the issues identified by the Governor, including issues of the abhorrent life crime, lack of insight, petitioner's attempt to explain the life crime by putting too much blame on unmet needs in childhood, a history of manipulation and narcissistic traits. Although the crime was admittedly abhorrent, after *Lawrence*, *supra*, 44 Cal.4th 1181*,* the Board could not find that factor was pertinent at

---

[4] A CDCR "RVR" [Rules Violation Report] Form 115 documents misconduct believed to be a violation of law that is not minor in nature (Cal. Code Regs., tit. 15, § 3312, subd. (a)(3)); see *In re Ryner* (2011) 196 Cal.App.4th 533, 551, fn. 3 (*Ryner*).)

the date of the hearing. The question was the risk of danger or threat to public safety posed by petitioner, if released.

The Board was convinced petitioner *did* have insight into his emotions and behaviors that led to the life crime. Regarding his unmet needs in childhood, as Presiding Commissioner Peck acknowledged, petitioner "frankly has been on a journey through his CAT-T [therapy] program to find out what got him involved in his life crime and he was articulating that." Peck thought petitioner had better explained in his testimony at this hearing why he committed the life crime and, although petitioner has a history of manipulation and had in the past shown some narcissistic traits, Peck did not see those traits at the time of the hearing. Deputy Commissioner Moore observed that petitioner had availed himself "of every available program" and did not "just sit in the chair," but took it into himself and personalized it, developing so he could deal with conflicts and the issues that have existed and continued to exist in his life, such as how to deal with anger, frustration, intolerance, and judgment. Moore noted that petitioner had been a volunteer in the pastoral care services hospice program since 2004 and that his description of that service "was very supportive of [his] demonstrated ability to live outside of [himself]." Petitioner's lead facilitator role in the Alternatives to Violence Program (AVP)and his discussion of that long-time participation "have demonstrated an ability to continue to be of service while learning from that service for [himself]." According to Moore, the risk assessments "all point to prosocial development with a gained perspective." Addressing petitioner directly, he stated: "You have demonstrated an awareness of your triggers regarding all of your character defects and have been able to discuss with this Panel how your family experience shaped you and continues to shape you as you discuss your relationship with your sister, your father, your brother. And you appear to understand the causes and conditions of what you did to Kristin Malmquist, why you did it[,] and you have demonstrated in a positive manner with positive work reports, laudatory chronos and no RVR[']s or 115[']s as well as your advancement in your education with both a master's in [1992] and your paralegal certificate in 2010 that you have worked hard towards developing rehabilitation, becoming different over 30 some odd years."

12

Speaking in opposition to parole at the hearing, Alameda County Deputy District Attorney Jill Klinge described petitioner as a "chameleon," arguing that petitioner was very good at listening to what the psychologists and the Board "keyed on" in past parole proceedings and then adjusting his answers and behavior accordingly.

Deputy Commissioner Moore addressed this concern in his comments amplifying the Board's decision to grant parole. He pointed out that had petitioner not adjusted his behaviors and responses to address issues and concerns raised previously by the Board, the Board would have brought it up. "If [petitioner] hadn't done something in response to a prior Board hearing where a suggestion had been made, [the Board would] bring . . . that up as not taking any suggestions. And [petitioner] did, in fact, take some suggestions." Thus, it was fully expected and necessary that petitioner adjust his behavior to meet concerns of the Board.

### 3. *The Governor's June 7, 2013 Reversal*

On June 7, 2013, Governor Brown reversed the Board's parole grant. The Governor acknowledged petitioner's "significant efforts to improve himself while incarcerated. He earned a master's degree and a paralegal certificate, and consistently received positive work ratings for institutional jobs. He has only been disciplined one time, in 1997. He has participated in many self-help programs, including individual and group therapy, domestic violence courses, and violence prevention workshops. Since [the Governor's] reversal, he has also participated in classes including Alcoholics Anonymous, Domestic Violence and Posttraumatic Stress Disorder, Violence Prevention Long-Term Treatment Group, Alternatives to Violence, Victim's Awareness, and Offender Responsibility. . . ." However, the Governor found these efforts were outweighed by negative factors demonstrating petitioner remained unsuitable for parole.

The Governor described the life crime and petitioner's stalking and threatening to kill his former girlfriend a few years before the life crime. The Governor stated he had reversed the previous 2012 grant of parole because of the heinous nature of the crime and because petitioner lacked insight, had a rather selective memory of his actions, and had continued to exhibit many of the same traits that led him to murder. Petitioner's

13

statements since then had not changed significantly and the Governor's concerns remained. Specifically, the Governor observed that petitioner "still maintains he does not recall having sex with the corpse, but acknowledges that it happened and offers an elaborate and contradictory explanation for his actions." The Governor concluded: "Mr. Brodheim's statements—that he engaged in necrophilia as a respite from his feelings of rejection, out of a confused sense of love, as a manifestation of rage and desire for control, and because he felt rejected—is muddled and suggests a desire to propose every possible explanation without truly exploring the causes of his obsessive and violent behavior."

The Governor also found petitioner's explanations for the planning and murder to be deficient. "He still blames his actions on feelings of childhood vulnerability and fear of abandonment by his mother. But unresolved feelings of abandonment does not adequately explain his meticulous, obsessive plotting of Ms. Malmquist's murder as he purchased multiple weapons, bought lighter fluid, lied to gain access to her house, bashed her head with a champagne bottle, and ultimately strangled her to death. Nor do childhood vulnerabilities explain how [he] became so fixated on Ms. Malmquist and willing to commit such horrific violence after only dating her for a few months, or his obsessive thinking and behavior toward his other ex-girlfriend."

### D. Habeas Proceedings Challenging the Governor's June 7, 2013 Parole Reversal

Petitioner sought a writ of habeas corpus in the superior court on August 30, 2013, challenging the Governor's June 7, 2013 reversal of the parole grant. That court denied the petition on January 22, 2014, finding "some evidence" in the record to support the ultimate conclusion that petitioner's release presents an unreasonable risk to public safety and rejecting petitioner's other due process claims. Petitioner filed his petition for habeas corpus in this court on March 20, 2014. We issued an order to show cause on June 23, 2014, limiting the question to whether "some evidence" supported the Governor's

14

reversal of parole.[5]  The Attorney General submitted a return on behalf of respondent and petitioner, represented by appointed counsel Michael Satris, filed his traverse.  We held oral argument on March 24, 2015. [6]

## III.

## DISCUSSION

### A.  Standards of Review

The standards  under which we review parole determinations of the Board and the Governor were recently reiterated in *In re LeBlanc* (2014) 226 Cal.App.4th 452 (*LeBlanc*):  "The 'awesome responsibility' of deciding whether to release a convicted murderer on parole 'lies with the executive branch, not the judicial branch.'  ([] *Lawrence*[, *supra,*] 44 Cal.4th [at p.] 1230 . . . (dis. opn. of Chin, J.) . . . .)  The Board's and the Governor's ' "discretion in parole matters has been described as 'great' [citation] and 'almost unlimited' [citation]." ' (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 . . . [(*Rosenkrantz*)].)

"Under Penal Code section 3041, a prisoner eligible for parole must be granted parole unless the Board or the Governor concludes 'the public safety requires a more lengthy period of incarceration.' (*Id*., subd. (b).)  Title 15, section 2402 of the California Code of Regulations, which governs a prisoner's suitability for parole, lists a variety of factors to be considered in evaluating a prisoner's suitability for parole, including the heinousness of the crime, psychological factors, institutional behavior, signs of remorse,

---

[5]  Petitioner also argued that the Governor failed to give him the individual consideration due him and denied him equal protection by failing to advise him as to what he needed to do to gain insight into his commitment offense and to become suitable for parole.  We limited our order to show cause to the question whether "some evidence" supported the Governor's determination.  (See *People v. Bloyd* (1987) 43 Cal.3d 333, 362–363 [issuance of order to show cause on a specific issue is an implicit determination that a prima facie case has not been made as to other issues in habeas petition].)

[6]  On December 9, 2014, another parole hearing was held and the Board once again granted parole to petitioner.  Petitioner filed a motion here seeking "preliminary relief," i.e., immediate release, which we denied.  On May 8, 2015, the Governor again reversed this most recent grant of parole.

15

age, and understanding and plans for the future. (*Id*., subds. (c)(1), (5) & (6), (d)(3), (7) & (8).)" (*LeBlanc*, *supra*, 226 Cal.App.4th at p. 456.)

"Although 'the Governor's decision must be based upon the same factors that restrict the Board in rendering its parole decision' ([(*Rosenkrantz*, *supra*, 29 Cal.4th] at p. 660), the Governor undertakes an independent, de novo review of the inmate's suitability for parole (*ibid*.). Thus, the Governor has discretion to be 'more stringent or cautious' in determining whether a defendant poses an unreasonable risk to public safety. (*Id.* at p. 686.) '[T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor. . . . It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the Governor's decision reflects *due consideration of the specified factors* as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision.' (*Id.* at p. 677, italics added.)" (*Lawrence*, *supra*, 44 Cal.4th at p. 1204.)

"While we have the authority to review a decision of the Board or the Governor denying parole to an eligible prisoner, our review is confined to ensuring the prisoner was afforded due process of law in the consideration of his or her application. (*Lawrence*, *supra*, 44 Cal.4th at pp. 1204–1205.) This entails ensuring the Board's or the Governor's decision 'reflects "an individualized consideration of the specified criteria" and is not "arbitrary and capricious." ' (*Id*. at p. 1205.) The latter consideration, a measure of the substantive merit of the decision, is satisfied if the record contains 'some evidence that the inmate remains a current threat to public safety.' (*Id*. at p. 1206.)

"The 'some evidence' standard is 'more deferential than substantial evidence review, and may be satisfied by a lesser evidentiary showing.' (*In re Shaputis* (2011) 53 Cal.4th 192, 210 . . . . [*Shaputis II*].) '[U]nder the "some evidence" standard, "[o]nly a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of [the Board or] the

16

Governor. . . .  [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor. . . .  It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. . . .” [Citation.]  [¶] . . . [¶] . . . Only when the evidence reflecting the inmate’s present risk to public safety leads to but one conclusion may a court overturn a contrary decision by the Board or the Governor.’  (*Id.* at pp. 210, 211.)  In determining whether a decision is supported by some evidence, we are not limited to the evidence actually mentioned by the Board or the Governor in their decision denying parole.  (*Id.* at p. 214, fn. 11.)  That said, the aggravated nature of the commitment crime alone does not provide such evidence ‘unless the record also establishes that something in the prisoner’s pre- or postincarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner’s dangerousness that derive from his or her commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety.’  (*Lawrence*, *supra*, 44 Cal.4th at p. 1214.)” (*LeBlanc*, *supra*, 226 Cal.App.4th at pp. 456-457, italics omitted; see, e.g., *In re Hunter* (2012) 205 Cal.App.4th 1529, 1538 [“We do not quarrel with the . . . assessment that [petitioner’s] commitment offense was egregious and callous.  But however horrible the crime, it is an insufficient basis for the denial of parole unless there is an evidence-based, rational nexus between the offense and present behavior.”].)

**B.  The Governor’s Reversal Is Not Supported by “Some Evidence”**

*1. Insight*

The Governor’s letter reversing the parole grant decision of the Board gave two primary reasons to support his determination that petitioner was currently dangerous: (1) that petitioner’s explanation of why he had sex with Kristin’s body was “muddled,” and (2) that petitioner’s unresolved childhood feelings of vulnerability and fears of abandonment did not adequately explain his meticulous, obsessive plotting of Kristin’s murder after only a few months of dating her.

17

### a. "Muddled" Explanation of Necrophilia

First, the Governor found petitioner's statements as to *why* he engaged in sex with Kristin's corpse (which petitioner does not recall, but acknowledges and accepts happened) were "muddled and suggests a desire to propose every possible explanation without truly exploring the causes of his obsessive and violent behavior." This reason appears unsupported by any evidence in the record. Petitioner has explored every possible explanation for that act and for his murder of Kristin through every avenue available to him. At the parole hearing, he stated he did not recall having sex with the corpse, but acknowledged and accepted that "it happened. And this was about rejection and my feeling inadequate as a person and not good enough and having sex with Kris would have provided a brief respite from that feeling that I'm not good enough and that I'm not deserving of love. This was a massive confusion of love and sex on my part. Also I was enraged at Kris and this was—doing so, having sex with Kris at that point was an expression of the rage that I felt toward Kris and also it was a way to exert a measure of control over that situation. Again, I had gone over there with the intent of trying to effect a reconciliation, had been unsuccessful, and so I was able to exert a last measure of control over the situation. But mainly it was this feeling of rejection. That I was inadequate and not worthy of being loved, something fundamentally inside of me was defective."

The Governor's premise that there is a discoverable explanation for the depraved necrophilia that can be reduced to a single, uncomplicated emotion or motivation is simply not supportable. As stated in *In re Morganti* (2012) 204 Cal.App.4th 904 (*Morganti*): "We think it appropriate to again point out, as have other courts, that it is questionable 'whether anyone can ever fully comprehend the myriad circumstances, feelings, and current and historical forces that motivate conduct, let alone past misconduct.' ([] *Ryner*, *supra*, 196 Cal.App.4th at p. 548.) Additionally, we question whether anyone can ever adequately articulate the complexity and consequences of past misconduct and atone for it to the satisfaction of everyone. As the California Supreme Court has recognized, 'expressions of insight and remorse will vary from prisoner to

prisoner and . . . there is no special formula for a prisoner to articulate in order to communicate that he or she has gained insight into, and formed a commitment to ending, a previous pattern of violent behavior.' ([*In re*] *Shaputis[]*, [2008] 44 Cal.4th [1241], fn. 18 [(*Shaputis I*)].)" (*Morganti*, *supra*, at p. 925.)

With respect to his admission to the act of necrophilia, petitioner's description of his mixed emotions appears consistent with the literature, which explains that "necrophiles frequently had more than one motive," including "to possess an unresisting and unrejecting partner," "reunion with a romantic partner," "attempt to gain comfort, or to overcome feelings of isolation," "attempt to gain self-esteem by the expression of power over a homicide victim." (Rosman and Resnick, *Sexual Attraction to Corpses: A Psychiatric Review of Necrophilia* (1989) 17 Bull. Am. Acad. Psychiatry Law, Vol. 17, No. 2, 153, 158-159.)[7] Not one of the numerous psychologists who have assessed petitioner has indicated that his explanation is "muddled," contradictory, inconsistent, or indicates a lack of insight.

Nor is it a basis for overturning parole that petitioner has maintained since his release from the hospital shortly after the commission of the crime, that he has no memory of his act of necrophilia, or of the statements he made during hospitalization. In

---

[7] Respondent maintains that citations to scientific literature as they pertain to petitioner's insight are irrelevant as this literature was not before the Board or the Governor (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 658 [inquiry is whether some evidence in the record before the Board supports the decision]) and because "it is not a judicial function to weigh conflicting views in the social or psychological sciences for the purpose of developing rules binding on the executive branch." (*Shaputis II*, *supra*, 53 Cal.4th at p. 220.) Petitioner admits this literature was not before the Board or the Governor, but denies that it should not be considered by us. The inquiry "whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation" (*Rosenkrantz*, *supra*, at p. 658), does not preclude the reviewing court from considering scholarly articles to assist in determining whether the evidence the authority relied upon to deny parole in fact constitutes "some evidence" probative of unsuitability under the statute and regulations, or whether that reliance was arbitrary and capricious. Petitioner maintains, and we agree, these articles may be used as an aid to our assessment of the rationality and logic of the Governor's finding that petitioner suffered from a dangerous lack of insight.

*Stoneroad*, *supra*, 215 Cal.App.4th 596, another division of this court concluded that the inability to remember committing an offense is not determinative. In *Stoneroad*, "notwithstanding [the] petitioner's acceptance of full responsibility for his criminal act and unquestioned remorse, the overriding issue for the panel was the extent to which petitioner's inability to remember committing his offense obstructed his ability to understand the factors that caused the criminal act." (*Id.* at p. 627.) The court explained that "an inmate's lack of insight into the causes of his criminal conduct cannot rationally be inferred from his inability to remember the conduct where, as in this case, he acknowledges his factual, legal and moral responsibility for the criminal act, and has expressed genuine remorse." (*Id.* at p. 629, 653 [no evidence that it was "extraordinarily unusual" for a person to have no recollection of the crime in the circumstances or that such was "rationally indicative of current dangerousness"]; *In re Young* (2012) 204 Cal.App.4th 288, 308; see also *In re Juarez* (2010) 182 Cal.App.4th 1316, 1341 [inmate's "failure to recall the details of his commitment offense or certain previous criminal activities has no bearing on his current dangerousness in light of his taking responsibility for the crime and his substance abuse problems, the sincerity of which is not disputed" (italics omitted)].) As the court in *Stoneroad* reasoned: "No evidence in the record supports the purely speculative proposition . . . that a person who does not remember committing a crime cannot understand the factors that caused him to commit the offense regardless whether he accepts full responsibility and is genuinely remorseful. . . ." (215 Cal.App.4th at p. 629.) When the Board or the Governor "considers a factor related to the commission of the life offense to be predictive of current dangerousness, 'it must articulate why that is the case. [Citation.] " '[I]mmutable facts such as an inmate's criminal history' . . . do not by themselves demonstrate an inmate '*continues* to pose an unreasonable risk to public safety." (*Lawrence*, *supra*, 44 Cal.4th at p. 1221, original italics.)' [Citation.]" [Citation.]' [Citation.]" (*Stoneroad*, *supra*, at p. 630.)

Petitioner's inability to recall having sex with Kristin's body after murdering her has never been questioned in the psychological reports. Indeed, Dr. Macomber concluded that petitioner's lack of memory was "unremarkable, for the circumstances

surrounding that extended dramatic episode are classic ones for producing amnesia. In my experience, it is not uncommon for murderers who kill to suffer from some amnesia, usually due to intoxication, head injury, or the very strong emotions involved in the killing. All three were present in Mr. Brodheim's case. Moreover, the amnesia [is] often tied to the culminating act of the great violence; that is, the most egregious or heinous aspect of the homicide. This psychological phenomenon is well known in the literature on amnesia, and is explained as a defense mechanism to that part of the violence that is most at odds with the individual's image of himself . . . . Basically, the conscious knowledge of the terrible act the individual took is so horrible and repugnant, and perhaps so discordant with and at odds with the way the individual thinks of himself, that the conscious [*sic*] will not permit the memory to form. Thus, the fact that the amnesia Mr. Brodheim experienced 'selected' or settled on the post-homicide sex is not indicative of any failure of insight or refusal to confront the magnitude of the offense."

Rather than avoiding the exploration of this disturbing aspect of his crime, petitioner has accepted full responsibility for it and has sought to deepen his understanding of it. His explanation was not "muddled," but appears to reflect his understanding of the complex mix of emotions underlying the behavior. It does not constitute "some evidence" of current dangerousness.

### b. Childhood Fears and Unresolved Feelings—Meticulous and Obsessive Planning

The same may be said with respect to the Governor's determination that unresolved childhood feelings of vulnerability and fears of abandonment did not adequately explain Petitioner's meticulous, obsessive plotting of Kristin's murder after only a few months of dating her or his obsessive thinking and behavior toward his former girlfriend a few years earlier.

As observed by Dr. Singh in the November 2012 Subsequent Risk Assessment, petitioner "demonstrated a good understanding of the impact of his childhood and abandonment on his development. Treatment has helped him recognize that when faced with perceived abandonment, he became overwhelmed by feelings of inadequacy,

21

resulting in anger and depression. Breakups with Kristin Malmquist and with a previous girlfriend . . . were similar; both young women chose to terminate relationships with him. Because he remained focused on his own pain, he had little appreciation for how his aggression impacted them. Because he had not worked through his earlier issues, when he met Ms. Malmquist he was no better equipped emotionally to deal with these problems. He blamed her for their problems and, feeling overwhelmed with depression and anger, planned to kill them both on the night of the Life crime."

The psychological assessments and risk evaluations are consistent with the insight described by petitioner during the hearing, including the following: "By that point I had, I mean, I had gone through, you know, I had gone into this period of depression and despair when it became clear that [K]ris had broken up—terminated the relationship with me and that my efforts to reconcile were not going to work. So, you know, that tapped into all of my insecurities that I wasn't good enough as a person. I wasn't worthy of being loved. And it was a downward spiral for me of depression, despair and ultimately rage at Kris. You know, it was also a sense of helplessness that I couldn't do anything to make the situation change to bring it back to the way it was before. [¶] . . . [¶] But ultimately it was rage. I was furious and I focused on Kris as the source of my problems. She was, again in my thinking then, Kris was my problem and I was, again, enraged with her." Admitting he planned to kill her and then himself, petitioner "acknowledge[d] and recognize[d] that my reaction, my feelings were completely disproportionate to the situation at hand."

Petitioner has spent the better part of 30 years through therapeutic and self-help activities offered in prison and in other prison programs, trying to learn why he acted as he had. He has explained the insight gained into his character defects and personality flaws. He acknowledged he had perceived that the victim had jilted him and that he reacted to that rejection with self-absorbed, obsessive despair, rage, and violence. He realized that the roots of his warped perception and his violent behavior lay in his relationship with his family (and particularly with his mother). This warped perception manifested itself in an obsessive need to be a perfect student and to control or manipulate

22

others and his relationships, his stunted emotional development, and his self-centeredness and belief in his own importance. All of these feelings and reactions covered up a massive insecurity. These realizations were thoughtful and rational, were not contradicted by any evidence, and demonstrate insight.

These conclusions are confirmed by the mental health professionals who have examined petitioner. For example, Dr. Kalich reported that "[i]n general, Mr. Brodheim displayed good insight into his past behaviors."

Similarly, Dr. Singh concluded: "During the present evaluation, Mr. Brodheim stated a clear understanding of the wrongs he has done and the harm he caused to others by his actions. Although he stated a desire not to dwell on his childhood experiences, he believed it was important to understand how his inability to resolve conflict impacted his actions at the time of the Life crime. . . . Through treatment in prison he has accepted that the root of his problems was his inability to handle conflict in a mature manner. He was absolutely clear . . . that these problems did not originate with either Ms. Malmquist or [the former girlfriend], but rather himself."

Dr. McDermott offered a more detailed narrative as to how petitioner has now arrived at a position where he understands what brought about his life crime: "In Mr. Brodheim's case, his crisis was obviously related to the abandonment he felt from both young women. However, it is likely this was related to the fear of abandonment from his mother, who was chronically abusive and appeared only to provide affection and attention in response to Mr. Brodheim's academic pursuits. Consistent with this theory, Mr. Brodheim's psychiatric diagnosis during his late adolescence and early twenties could be most accurately characterized as Borderline Personality Disorder. Because Mr. Brodheim has spent the last 28 years in self-exploration, including at least eight years in individual therapy, it is my opinion that such conflicts have been resolved. *Numerous evaluators comment on Mr. Brodheim's insight resultant from intensive therapy.* Mr. Brodheim now recognizes the role that his mother played in the development of his personality structure, although he has never been accusatory toward her or placed the blame for his crime on her. Additionally, as noted previously and documented by

research, the prominent affective state associated with Borderline Personality Disorder diminishes with age and treatment; as such, Mr. Brodheim no longer meets the diagnostic criteria for this disorder." (Italics added.)

Fundamentally, the Governor's characterization of petitioner's explanation for the life crime is not accurate. It shoehorns the lengthy and nuanced discussion into a single, simplistic narrative of petitioner blaming his actions on "his feelings of childhood vulnerability and fear of abandonment by his mother," and ignores the full range of the insight described by petitioner, the relevant assessments, and the observations of others who have spent significant time with petitioner through his incarceration and rehabilitation process.

### 2. *Nexus to Current Threat*

Not only does the record fully support the conclusion that petitioner has insight into his life crime and previous behavior, but we emphasize that even if he lacked insight, there must be some evidence that this deficiency is material to the question of his current dangerousness. As *Morganti*, *supra*, 204 Cal.App.4th 904 also recognized, some doubt as to insight "is beside the point: the decisive inquiry is not whether there is 'some evidence' [petitioner] 'lacks insight' into his past criminal conduct or the cause thereof, but whether he constitutes a current threat to public safety. (*Lawrence*, *supra*, 44 Cal.4th at p. 1212; *Rosenkrantz*, *supra*, 29 Cal.4th at p. 658.) In other words, whether there is any connection between any lack of insight on his part and the conclusion that he is currently dangerous. Even if—as we do not believe—reasonable minds could find 'some evidence' in the record that [petitioner] lacks a satisfactory level of insight of some sort, the record is manifestly bereft of evidence connecting any such deficit to the conclusion he would present a risk to public safety if released on parole." (*Morganti*, *supra*, at p. 925, italics omitted.)

As in *Morganti*, petitioner's positive institutional behavior, his age, his lengthy participation in virtually every rehabilitative program available to him, his statements to and the assessments of the psychologists who have evaluated him, the massive number of positive letters and chronos from people who have worked with him in a variety of

24

settings, and his statements to the Board do not establish any likelihood petitioner would present a risk to public safety if released on parole. "They are rationally indicative only of suitability for parole, not unsuitability." (*Morganti*, *supra*, 204 Cal.App.4th at p. 925; see also *Ryner*, *supra*, 196 Cal.App.4th at p. 545 ["some evidence" supports reliance on "immutable facts such as an inmate's criminal history . . . *only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety"] (original italics).)

"Where, as here, undisputed evidence shows that the inmate has acknowledged the material aspects of his or her conduct and offense, shown an understanding of its causes, and demonstrated remorse, the Governor's mere refusal to accept such evidence is not itself a rational or sufficient basis upon which to conclude that the inmate lacks insight, let alone that he or she remains currently dangerous." (*Ryner*, *supra*, 196 Cal.App.4th at p. 549.)

### 3. Other Reasons

We are not limited to the reasons stated by the Governor for denying parole. (*Shaputis II*, *supra*, 53 Cal.4th at pp. 214-215, fn. 11.) The Governor's reference to his previous 2012 parole reversal and his concerns that petitioner "has continued to exhibit many of the same traits that led him to murder," warrant some discussion.

**a. Narcissism, Lack of Empathy and Other Alleged Character Traits**

The record is consistent with the view of petitioner as a man who has learned humility. For example, supporting letters and chronos report on petitioner's comments regarding his service on the work crew, where he acknowledged he was among the least skilled and that his lack of experience compared to peers' experience was "humbling." Petitioner also discussed his many years of service to hospice and to the blind reading program. He also demurred to having played a "leadership" role in AVP program, despite information from others who viewed his participation as showing leadership. The director of the pastoral care services, in which petitioner has participated for years, noted petitioner's compassion and caring for individuals in the hospice program. "Reverend Knauf adds that in their discussions over the years, [petitioner] has expressed guilt and

shame for the Life crime and 'I find his compassion and tears to be genuine expressions of a man broken, transformed and placing supreme value on human life.' " A letter from Rabbi Sudran also noted petitioner's " 'steadfast commitment to both nonviolent conflict resolution and personal growth' " and petitioner's connection to both the Jewish and Buddhist communities, stating: "From my conversations with him, I know that [petitioner] has extensively explored the personal and psychological dynamics that led to his taking of a human life. I know that, at a spiritual level, he is deeply troubled by the enormity and horror of that act, as well as his inability to fully atone for it, while at a personal and practical level, he had dedicated himself to ensuring that he never again engages in the toxic and violent behavior of his youth." As observed in Dr. Singh's latest evaluation, "During his incarceration he has developed the ability to empathize with others, an ability that was not present in the past."

Therefore, it is clear that at the time of the November 2013 hearing, and for some years before, there was no evidence of narcissism, lack of empathy for others, or other character traits that would support a finding of current dangerousness.

### b. Manipulation

It is suggested that this admittedly brilliant man has been putting on an act for many years, feigning humility and simply molding himself to whatever recommendations were being made by the Board, the Governor, and others so he could achieve parole. However, no evidence supports this suggestion. A parole decision by the Governor or Board must be grounded on at least some evidence. It cannot be based on supposition and speculation. (See *Ryner*, *supra*, 196 Cal.App.4th at p. 548 ["it is settled that the Board may not base its findings on hunches, speculation, or intuition"].) It is sheer speculation, unsupported by any evidence, that petitioner has, or could have, completely fooled numerous psychologists, therapists, and others involved in the system and in his rehabilitation over the course of his lengthy prison term. The Board addressed and rejected this suggestion, pointing out that had petitioner failed to address the issues raised by the Board in prior hearings or failed to follow its recommendations, the Board would have held such failures against him.

26

It is true that while incarcerated at Folsom State Prison in 2000, petitioner reported auditory hallucinations and a feigned suicide attempt in a desperate effort to transfer out of Folsom to avoid physical and sexual harm by other prisoners he believed were intent on assaulting him. He had been sexually assaulted on two occasions early in his incarceration and his concerns were accepted as real by the Board. He first admitted having fabricated the hallucinations in a therapy session in 2009; and made the same admission to the Board in July 2012. He explained, and the Board believed, that after other, more direct options had failed, petitioner concluded he had no other option as he feared for his life. Petitioner admitted he should not have allowed the record to go uncorrected for 12 years, that he should have affirmatively raised the matter, but that he lacked the courage to bring it up before then. However, he "became increasingly uncomfortable with shading the truth just because it's simpler to do so" as he progressed in his studies of Buddhism. The Governor's reversal does not directly refer to this 2000 incident or to petitioner's belated failure to correct the record, apparently recognizing that it has no rational nexus to petitioner's "dangerousness." Rather, petitioner's owning up to the truth of the matter supports the Board's finding of suitability.

"[W]e have reviewed the materials that were before the Board and have found no evidence that could support a decision other than the one reached by the Board. Consequently, there is not some evidence to support the Governor's decision to reject the Board's grant of parole . . . ." (*In re Dannenberg* (2009) 173 Cal.App.4th 237, 256-257.) " '[W]here, as here, it is determined there is not 'some evidence' in the record to support the Governor's decision to overrule the Board's grant of parole, the proper remedy is to vacate the Governor's decision and to reinstate that of the Board.' [Citation.]" (*Id.* at p. 256; accord, *Ryner*, *supra*, 196 Cal.App.4th at p. 553.)

## IV.

## DISPOSITION

The Governor's decision reversing the Board's January 8, 2013 grant of parole is vacated and the Board's parole release order is reinstated.

_____
RUVOLO, P. J.

I concur:


_____
RIVERA, J.

I respectfully dissent.  All that is required to uphold the Governor's decision to reverse the Parole Board's grant of parole is "some evidence" that Brodheim poses a continuing threat to public safety.  Some such evidence exists and was duly considered by the Governor.

The commitment offense involves Brodheim's strangulation of the victim after being rejected by her and, after causing her death by strangulation, having sex with the corpse.  He claimed that he could not recall the details of the act of necrophilia, but did not dispute that the act occurred.

Given the heinous nature of the commitment offenses, considered with the claim of lack of recollection concerning the necrophilia, there was some evidence from which to conclude that Brodheim lacks insight and poses a continuing threat to public safety if released.  The Governor's reversal of the Board's grant of parole should stand.

_____
REARDON, J.

1